659 So.2d 785 (1995)
STATE of Louisiana,
v.
Johnny T. PHILLIPS.
No. 94-KA-673.
Court of Appeal of Louisiana, Fifth Circuit.
March 1, 1995.
*786 John M. Mamoulides, Dist. Atty., Terry M. Boudreaux, Asst. Dist. Atty., Louise Korns, of counsel, Office of the Dist. Atty., Gretna, for plaintiff/appellee.
Bruce G. Whittaker, 24th Judicial District, Indigent Defender Bd., Gretna, for defendant/appellant.
Before DUFRESNE, WICKER and GOTHARD, JJ.
GOTHARD, Judge.
On November 19, 1992, defendant, Johnny Phillips, was charged by grand jury indictment with the second degree murder of Ronald Petit, in violation of LSA-R.S. 14.30.1. He was arraigned on December 21, 1992 and entered a plea of not guilty. After a jury trial on the merits, the defendant was found guilty as charged on May 2, 1994. On June 3, 1994 he was sentenced to imprisonment at hard labor for a term of life, without benefit of parole, probation or suspension of sentence. On that same day the defendant gave notice of his intent to appeal the verdict and sentence.

FACTS
On January 13, 1992, members of the victim's family reported to Jefferson Parish Sheriff's Office that they had not seen him since the previous December and were concerned for his welfare. Sergeant Melvin Stokes, who was assigned to investigate the matter, spoke with Mr. Petit's sister, Rose Louviere. She advised the officer that Petit had a roommate named "Johnny", who was subsequently identified as the defendant. *787 The victim's family also told officers that someone had been using Petit's credit cards. Sergeant Stokes went to the victim's residence in Harvey. He found no signs of forced entry or evidence of foul play. Continuing his investigation, the officer interviewed the assistant principal of Landry High School, where the victim was employed as a teacher. He was informed that Petit left school on the afternoon of December 20, 1991 and did not return as scheduled after the holidays. Further interviews with other teachers who knew the victim revealed that it would be unusual behavior for Petit to leave his pets unattended.
In his effort to locate the victim, Sergeant Stokes spoke with Allie Martin, the defendant's girlfriend, and later with the defendant, who gave the sergeant a written statement on January 23,1992. In that statement the defendant related that he lived with the defendant off and on for about six years. He stated that he last saw the victim on the morning of December 21, 1991 when Mr. Petit left in a "Winnabago" type van for a cross-country trip. The defendant maintained that he spoke to Petit on the telephone on the 23rd when Petit asked him to take care of the pets and to send flowers to his father and step-mother in Houma for Christmas. Phillips agreed to do as Petit asked. The defendant stated that Petit did not indicate from where he was calling, and defendant did not ask; but Phillips said that he heard music and laughter in the background. The defendant denied using the victim's credit cards and automatic bank teller card, or making long distance calls in Mr. Petit's name. Sergeant Stokes interviewed the defendant again on February 18, 1992, but received no further information.
The investigation was turned over to Lieutenant Kevin Theriot who continued to question the defendant. At that time the defendant told police he last saw the victim at about 12:30 A.M. on the morning of December 21, 1991, when Petit went to bed depressed. The defendant said that later that morning he saw a "beige Coachman van" leave the residence and assumed that Petit left in it. Again the defendant denied using the victim's credit card or ATM card. When Lieutenant Theriot advised the defendant that other witnesses contradicted that fact, the defendant reluctantly admitted he used Petit's credit card and ATM card. He told Lieutenant Theriot that he had written permission from Petit to use the cards and his automobile. However, no such document was produced by the defendant. Police officers obtained a search warrant for Petit's home but found nothing to help in the investigation.
Subsequently, on March 29, 1992, the Sheriff's Office received a report that a body had been found buried in a shallow grave in a remote area near a canal in Lafitte, Louisiana. Detective Ralph Sacks later arrived at the location, secured the scene and contacted the necessary personnel to exhume the body the following day. Before leaving the area, Detective Sacks was notified that there were two females at the fire station in Lafitte who were requesting to see a detective. After arriving at the station, he spoke with the two females, Allie Martin and Deolia Baldassaro. Ms. Martin, the defendant's girlfriend, was "extremely upset ... she looked like a basket case ... just very emotional" and she was inquiring if the police had unearthed the remains of Petit.
The next day Detective Sacks returned to the area along with Mary Manhein, a forensic anthropologist, who would assist with the recovery of the body. They found numerous papers in the vicinity of the grave site. Some of the papers bore the names "Ron Petit" and "Johnny Phillips" and seven of the papers were receipts from ATM transactions. All seven stated that "amt exceeds limit" and one also noted that a withdrawal in the amount of $180.00 had been made. Additionally, the receipts indicated that those transactions were conducted between 1:40 a.m. on December 21, 1991 and 8:17 p.m. on December 22, 1991. They also found a wallet which contained an identification card bearing the name "Ron Petit."
Ms. Manhein subsequently exhumed the body which was wrapped in a green vinyl tablecloth and secured with twine. In the grave, there were also two cigarette butts, one beneath the body and the other near the surface. Ms. Manhein stated that it was not *788 possible to determine exactly how long the body had been buried. Her opinion was that the body could have been in the grave as little as three weeks prior to discovery, but that it could possibly have been there since December 20, 1991.
Dr. Fraser Mackenzie performed an autopsy on the body which was subsequently identified as Petit's. He noted that the hands and feet were tied behind the back with a cord and a chain. The eyes were blindfolded with black electrical tape and a red bandanna, and the mouth was gagged with half of a pillowcase and black electrical tape. Inside of the mouth, "stuffed all the way in the very back of the throat," there was a white sock with a "red ring at the top". In Dr. Mackenzie's opinion, Petit's death was a homicide caused by "occlusion of the nasal and oral passages by blocking the back of the throat so he couldn't breath." He estimated that death occurred within a range of two weeks to six months before the body was discovered.
After the body was found, Lieutenant Theriot again searched Petit's residence where he found twine and electrical tape similar to that used to bind the body. Lieutenant Susan Rushing took over the investigation and she interviewed family members and neighbors of Petit. After obtaining the consent of Herbert Petit, the victim's brother, she searched the residence and seized 39 "athletic socks" from the dresser in the defendant's bedroom. She later searched the residence a second time and recovered half of a pillowcase in the utility room under several items of debris. She also noticed that there was a pillowcase missing from the defendant's bedding.
The F.B.I. laboratory analyzed several items of evidence, reaching certain conclusions to which various members of the organization testified. Agent Douglas Deedrick, an expert in hair and fiber identification, found no difference between the pieces of twine recovered from Petit's body and the twine found at the residence. Also, he determined that the half of the pillowcase from the gag matched the half of the pillowcase recovered from Petit's residence.
Agent Richard Buechele, an expert in materials analysis, found that the black electrical tape removed from the blindfold and gag was "consistent" with the black electrical tape recovered from the residence.
The State presented several other witnesses. Among them was Bobby Gene Posey, who testified that when he was a cell mate of the defendant in August of 1992, the defendant told him that he was charged with using his roommate's ATM card, and that he would soon be charged with his roommate's murder. The defendant noted that his roommate was killed in the house and that when he was found he had a gag in his mouth with tape across it and his hands, and legs were tied up behind his back with a rope and chain. He stated that the body was found at "his favorite fishing hole" in Lafitte and that he was worried that his fingerprints were on the tablecloth which was used to wrap the body. Posey added that, although the defendant admitted using the ATM card to obtain money from his roommate's account, he did not admit killing his roommate. Posey said the defendant recounted an argument he had with his roommate shortly before Christmas when he called his roommate's girlfriend a "whore".
Anthony J. Pierce testified that, when he was the defendant's cell mate, he found a letter written by the defendant which stated "I ... did the crime and now I must do the time." Pierce also stated that "he had tied his roommate up and suffocate (sic) him and bury (sic) him" at one of his fishing spots in Lafitte and that he had thrown papers around the grave site.
Hubert Gervis, Petit's neighbor, testified that in November of 1991 Petit came over to his residence after a confrontation with the defendant and Petit was "real scared." He further stated that the defendant did move out of Petit's residence and the locks were changed; however, the defendant later moved back in as Petit's roommate.
Several other witnesses testified that the victim was fearful of the defendant and tried to evict him from the residence. Rose Louviere, Petit's sister, testified that Petit was "fearful for his life" and very afraid of the defendant. Thomas M. Gereighty, an attorney *789 who represented Petit in a civil matter, testified that he advised Petit to change the locks on his house and to avoid meeting with the defendant. Evelina Doakes, Petit's friend, testified that when she spoke to the defendant on the telephone on December 20, 1991, his voice sounded as though he was frightened.
Deborah Olsen testified that on December 23, 1991 she was employed by a "900" sex talk line and on that date she received a call from someone representing himself to be Petit. According to Olsen, the unusual thing about the call was that they did not talk about sex. Peggy Fourroux, the defendant's former girlfriend, testified that the defendant made approximately 20 calls to "900" sex chat lines.
Curtis Verdin testified that he went fishing with the defendant and had once accompanied him to a fishing spot near where the body was found. He also observed the defendant withdraw $200.00 from an ATM outlet.
Deolia Baldassaro testified that in December of 1991 or January of 1992, she accompanied Allie Martin and the defendant to an ATM outlet where the defendant withdrew a sum of money. Considering the defendant's spotty employment history, she found that surprising.
Deborah Westfall testified that for New Year's Eve of 1991, the defendant spent $200.00 on fireworks, an unusually large expenditure for him in her experience.
Rosa Chappelear, an officer with Petit's bank, testified that as of December 20, 1991, Petit had $4,073.50 in his account. By January 23, 1992 the account was debited with ATM withdrawals resulting in a balance of $361.99. Between those dates, there were numerous ATM withdrawals in the amount of $200.00.
Fred Linder, a credit card fraud investigator with Citibank, testified that he investigated Petit's Visa account. He found that the card usage followed a fairly consistent pattern until December of 1991 and January of 1992. In particular, he found thirteen charges made at a Shell gas station between December 21, 1991 and January 10, 1992, whereas prior to that time there were only four charges at the station.
Allie Martin, the defendant's former girlfriend, testified that in December of 1991 she observed an argument between the defendant and Petit. Shortly thereafter, she noticed that the defendant had more money than he had previously. She also stated that when she learned that a body had been found in Lafitte, she contacted the police to find out if it was Petit.

LAW
On appeal the defendant assigns four errors. In the first assignment he asserts that the trial court erred in allowing Petit's attorney to testify regarding "legal advice" given because it violates the attorney-client privilege. During the trial, the State called Thomas M. Gereighty to the stand. Gereighty testified that he is an attorney who represented Petit in a "trip-and-fall-type accident" which occurred at Audubon Park. Pursuant to that representation, Gereighty drove Petit and safety expert, Bill Gallardo, to the Park in order to perform a safety inspection "under discovery" in October or November of 1991. While they were driving to or from the Park, Petit, the front seat passenger, informed Gereighty of a confrontation that he had with the defendant. Gereighty advised him to change the locks on his house and to avoid any type of meeting with the defendant. At the time of the conversation, Gallardo was sitting in the rear seat of Gereighty's vehicle. The trial court permitted Gereighty to testify reasoning that, since the statements were made in the presence of Bill Gallardo, a third party, the conversation was not a confidential communication.
Defendant bases his argument on LSA-R.S. 15:475, which was in effect at the time of the conversation at issue,[1] and provided as follows:

*790 No legal adviser is permitted, whether during or after the termination of his employment as such, unless with his client's express consent, to disclose any communication made to him as such legal advisor by or on behalf of his client, or any advice given by him to his client, or any information that he may have gotten by reason of his being such legal adviser.
R.S. 15:475 and the case law interpreting it involves situations in which the client is also the defendant. The flaw in defendant's argument is that the defendant is not the client, had no relationship with the attorney and, therefore, cannot invoke the attorney-client privilege. It is the victim and his legal representatives, not the defendant, to whom privilege belongs. LSA-C.E. 506; State v. Maillian, 464 So.2d 1071 (La.App. 1st Cir.1985), writ den. 469 So.2d 982 (La. 1985). R.S. 15:475 is inapplicable to this factual circumstance and the defendant's arguments regarding the confidentiality issue are irrelevant.
In his next assignment defendant argues that the trial court erred in permitting Deborah Westfall to testify concerning statements allegedly made by appellant without the state having previously disclosed the statements in discovery or by way of pretrial notice pursuant to LSA-C.Cr.P. art. 768.
LSA-C.Cr.P. art. 768 provides as follows:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
The purpose of the notice is to avoid surprise and to allow fair opportunity to plan or present a defense in light of the damaging statement. State v. Billiot, 421 So.2d 864 (La.1982). An "inculpatory statement" within the meaning of this article refers to an out of court admission of incriminating facts made by the defendant after the crime has been committed. An incriminating statement is one which admits a fact tending to establish guilt, or from which guilt may be inferred. State v. Bodley, 394 So.2d 584 (La.1981). Improper introduction of inculpatory statements mandates reversal only if the accused is prejudiced by failure to disclose. State v. Grant, 517 So.2d 1151 (La.App. 5th Cir.1987).
At trial, Deborah Westfall testified that in February of 1992 the defendant told her the police thought he had killed Petit and had buried him in the backyard, "but he said it wasthe guy wasn't buried back there."
Following the conclusion of her direct examination, defense counsel approached the bench and stated that he had not been given any notice of Westfall's testimony, which, in his view, included inculpatory statements. Defense counsel then stated that he would do what he could on cross-examination and he noted that he wanted to preserve the record because he thought the State was not giving him proper notice "of these things."
Subsequently, during cross-examination, Westfall elaborated on the statement by testifying as follows:
Q. You testified that Mr. Phillips [defendant] thought that the police thought that he had killed him [sic] roommate and buried him in the backyard; is that what you said?
A. Yes.
Q. Okay. And you said that Mr. Phillips told you that he wasn't buried in the backyard.
A. Yes.
Q. Did Mr. Phillips tell you he knew where he was buried?
A. No.
Q. In fact, he said he knew he was not buried in the backyard
A. Yes.
Q. because there was a tomato
A. Right.
Q. garden in the backyard.
A. Yes.
Q. And that's what he was working on.
A. Uh-huh (affirmative response).
Q. Did he tell you that the police told him in an interview that he thought or that *791 they thought he buried him in the backyard?
A. No.
The defendant claims that the statement was inculpatory in the manner used because it raised an inference that the defendant knew where Petit's body was buried. We disagree. The statement as a whole did not tend to establish or infer guilt so as to be considered inculpatory. The statement merely revealed that the defendant knew Petit's body was not buried in the backyard because there was a tomato garden there which the defendant maintained. Therefore, compliance with LSA-C.Cr.P. art. 768 was not a necessary prerequisite to the admission of the testimony.
Moreover, the defendant does not suggest how his defense would have been different had he been apprised of the State's intention to use the statement nor does he allege any prejudice from the failure to provide notice.
In his third assignment of error, the defendant asserts the trial court erred in permitting a state witness to testify in such a way as to "summarize" the state's case against the defendant in testimony that by its very nature was replete with inadmissible hearsay. The basis of the argument is testimony offered by Lieutenant Susan Rushing. Before the State called Lieutenant Rushing to the stand, defense counsel, at a bench conference, requested that the trial court limit the testimony "to only that of which she has personal knowledge ... thereby speeding things up if we have her take the case from where she received the case and then to the conclusion of the case." When the trial court questioned him about the request, he noted that "any testimony as to what occurred during the missing persons investigation in December is only hearsay to Ms. Rushing", but the court refused "to limit her in that regard."
Lieutenant Rushing subsequently testified that the telephone records of Petit's residence revealed that a "one nine hundred" call to a "sex line" was made on December 23, 1992 and that prior to that time no other such calls were made. She stated that the telephone records of Peggy Fourroux's residence indicated that when the defendant resided with her there were in excess of twenty "one nine hundred" calls to a "sex line" made from her residence. She also stated that the bank records of Petit showed that following his disappearance, his ATM card which had only been used three times in 1991, had been used numerous times thereby reducing the account balance from in excess of $4,000 to approximately $351.00.
She stated that the defendant's employment records revealed that he worked for Delta Catering Co. as a galley hand and then he worked for Professional Divers as a dive tender. His employment with Professional Divers began in July of 1991 and ended on September 29,1991, and from that date there was no record of any other employment.
She testified that Petit's medical records reflected that in May of 1991, he sought treatment for an injury to his hand and in December of 1991, he was diagnosed as having an upper respiratory tract infection.
Lieutenant Rushing said her investigation revealed that Petit never wore athletic socks, that the F.B.I. determined that a sock, which was removed from a dresser drawer in the defendant's bedroom and which appeared to be quite similar to the one found in Petit's throat, did not "match exactly" the sock found in the throat, that the F.B.I. informed her that there was a green fiber located on the sock which was found in Petit's throat, and that Petit's clothes were removed from his residence by his family.
She noted that the F.B.I. advised her that it would be a duplication of efforts to compare twine collected in the utility room to the twine removed from Petit's body considering it appeared to be the same as other twine found in and outside of the residence. She also noted that an R.J. Reynolds chemist examined the cigarette butts recovered from the grave site, but he was only able to determine that they were one hundred millimeter length cigarettes as opposed to standard size cigarettes.
She also stated that the Assistant Principal of Landry High School informed her that Petit failed to report back to work on January *792 6, 1992 and that he was not granted an additional week of vacation time.
She further testified that Anthony Pierce, the defendant's former cell mate, found a piece of paper under the defendant's bunk, which had several lines written on it.
The defendant argues that the above testimony is inadmissible hearsay and its admission constituted reversible error.
Hearsay evidence is defined in Code of Evidence Article 801 C as, "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." We have reviewed the testimony in question and find that the defendant's point is well taken as to some parts. However, we do not find the admission of the testimony to warrant reversal.
The proper analysis for determining harmless error is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error". Sullivan v. Louisiana, ___ U.S. ___, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); State v. Code, 627 So.2d 1373 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994), rehearing denied, ___ U.S. ___, 114 S.Ct. 2775, 129 L.Ed.2d 887 (1994).
Considering that the admissible evidence presented at trial overwhelmingly established that the defendant killed Petit by suffocating him, it is beyond doubt that the guilty verdict was unattributable to any erroneously admitted hearsay testimony. As such any error was harmless.
In the final assignment of error the defendant requests a review of the record for errors patent on the face. We have conducted such a review and find two errors. First, the hard labor sentencing form fails to reflect that the defendant was given credit for time served in accordance with C.Cr.P. art. 880. Second, at the time of sentencing, the trial court did not inform the defendant of the prescriptive period for post-conviction relief as is mandated by LSA-C.Cr.P. art. 930.8(C).
We amend the hard labor form to reflect that the defendant is given credit for time served. Additionally, the trial court is directed to inform the defendant of the Art. 930.8 provisions by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof of defendant's receipt of such notice in the record of the proceedings.
The defendant's conviction and sentence are affirmed as amended and the matter remanded for further action consistent with this opinion.
AFFIRMED AS AMENDED; REMANDED
NOTES
[1] LSA-R.S. 15:475 was repealed on January 1, 1993 with the enactment of Chapter 5 of the Louisiana Code of Evidence; however, communications made prior to the above date, which are subject to a valid claim of privilege under the prior law, retain their privileged character unless waived. Louisiana Acts 1992, No. 376, Section 6.