hMcMANUS, Judge.
This appeal arises from the conviction and sentence of Ulysses Jones, Jr. for the first degree murder of Jefferson Parish Deputy James Clarius in violation of LSA-R.S.14:30. The jury voted unanimously to convict Ulysses Jones, Jr.; however, it deadlocked during the penalty phase of the trial. Subsequently, the trial court sentenced the defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence. On appeal, defendant claims that the trial court erred in denying a mistrial when the State introduced defendant’s statements to police 'without notice, and that the trial court further erred in admitting impermissible hearsay. For the following reasons, we affirm the defendant’s sentence and conviction, and remand for the trial court to give defendant notice of the time limits to apply for post-conviction relief.
FACTS
Deputy James Clarius was murdered around 6:45 a.m. on October 5, 1996. The State alleged that defendant murdered Deputy Clarius shortly after robbing a convenience store.
On the morning of October 5, 1996, Willie Carter was employed as a cashier at a convenience store at the corner of Ridge-lake Drive and Veterans Memorial Boulevard in Metairie. According to Mr. Carter, a small dark-colored car driven by a black man pulled up to the gasoline pump outside the ^convenience store. Mr. Carter signaled to the man that he had to come inside the store to pay for the gasoline in advance. The man entered the store and went to the back of the store where he selected a bottle of Crazy Horse malt liquor. The man walked to the check out counter, set the malt liquor down, and asked for the price of a pack of cigarettes. As Mr. Carter placed the malt liquor in a bag, the man reached into his pants pocket, pulled something out and said, “Bitch, give it up.” Mr. Carter did not see the object because the defendant had a towel over his hand. Mr. Carter thought that the object was a gun, so he immediately dropped to the ground, moved quickly to the back of the store to the office, and closed the door behind him. Mr. Carter’s supervisor, Evan Marie Reed, was in the office. Mr. Carter informed Ms. Reed that a robbery was occurring. Ms. Reed told Mr. Carter to call 911 while she observed the man though a tinted window that permitted observation from the office to the store. Ms. Reed saw the man remove money from the cash register drawer and exit the store. Both Mr. Carter and Ms. Reed observed the man turn and look around. When the man turned to leave, he walked right by the one-way observation window where Ms. Reed watched him intently. After the robber exited the store, he got into his car and drove down Ridgelake Drive toward Lake Pontchartrain. Ms. Reed ran outside and saw that the robber fled in a fairly new, mid-size, dark purple or blue car.
After the robber drove away, Mr. Carter and Ms. Reed saw a police car pass in front of the store, however, the police car did not stop. Deputy Charles Love, the driver of the police car, was responding to an unrelated burglary alarm. As Deputy Love drove by the convenience store, he noticed a black man walking out of the convenience store. For a few seconds, | ¡¡Deputy Love and the man glanced at each other. Then, Deputy Love turned onto Veterans Memorial Boulevard from Ridgelake Drive and looked toward the convenience store, where he observed a woman exit the store and look around frantically. At approximately the same time, Deputy Love received a dispatch call reporting a robbery at that location. Deputy Love notified the other police officer responding to the unrelated burglary alarm, Deputy Munch, of the robbery. Thereafter, Deputy Love patrolled the area, looking for suspicious activity. While on patrol, Deputy Love heard a radio dispatch that a deputy had been shot at the corner of Page Drive and West *711 Esplanade Avenue near Lake Pontchartrain, and he responded. Upon arriving at that location, he observed medical personnel attending the fallen deputy.
Louisiana State Police Trooper Larry Anderson also heard the broadcast reporting a robbery at the convenience store on Veterans Memorial Boulevard and began patrolling the area in the vicinity of the robbery. While patrolling the area, he heard the dispatch that a deputy had been shot; and, since he was only seconds away from the location, he responded immediately. Upon arriving at the scene, Trooper Anderson noticed a police car with its lights flashing near the corner of West Esplanade Avenue and Page Drive and a deputy on his back in the middle of the road. Trooper Anderson, the first officer on the scene, requested medical assistance and administered CPR to the wounded officer, who had no pulse. While assisting the injured officer, Trooper Anderson noted that the deputy had four bullet wounds to the chest. Jessica Douget, a concerned motorist trained in CPR, saw Trooper Anderson attending to the fallen deputy and pulled over to assist. Both Trooper Anderson and Ms. Douget saw that the deputy’s weapon was missing, and that handcuffs and a watch were on the ground. |4Dolores Jane Fuller, the paramedic who responded to the emergency call, transported the wounded officer to East Jefferson General Hospital. Ms. Fuller also did not see a gun in the vicinity of the deputy’s body. The wounded deputy died on the way to the hospital. Dr. Susan Garcia performed an autopsy on October 5, 1996, and concluded that the cause of Deputy Clarius’s death was multiple gunshot wounds to the chest and the abdomen.
Lieutenant Steve Buras supervised the homicide investigation. He arrived at the murder scene around 7:15 a.m. on October 5, 1996. Lt. Buras observed the marked police car parked on Page Drive, about 30 feet from West Esplanade Avenue with its overhead lights turned on, its windows open, its doors closed, and its engine running. Lt. Buras noticed a set of handcuffs with one cuff partially open lying in the street. He also found a watch, with “Brit-tania” inscribed on its back. Upon turning the watch over, Lt. Buras noticed that the watch’s face was silver with a Lady of Liberty, in gold, in its center. Deputy Clarius’s schedule of calls, located inside the police unit, contained no entries. Deputy Clarius worked under the supervision of Lt. William Thompson who recalled that Deputy Clarius had radioed headquarters asking for a description of the robbery suspect on the morning of the homicide. Four 9 mm spent casings located on the street were recovered at the scene, but Deputy Clarius’s gun was not recovered at the scene. By stipulation, it was agreed that the bullets removed from Deputy Clarius’s body were fired from the slain deputy’s gun and that the four casings recovered from the scene were fired from that gun.
Two days after the homicide, Lt. Buras showed a photographic lineup to the robbery victims, Mr. Carter and Ms. Reed, on October 7, 1996, and [¡¡they identified the defendant as the robber. Later, Deputy Love also identified the defendant as the man that he saw walking out of the convenience store on the morning of the homicide.
Lt. Buras interviewed several witnesses who also testified at trial. On the morning of the homicide, Ms. Leslie Perez Montgomery left home at approximately 6:35 a.m. As she was driving along West Esplanade Avenue near Page Drive, the only other traffic on the road was a police car proceeding in the opposite direction in pursuit of a black vehicle. Ms. Montgomery observed both vehicles slow down, and noticed that the car in front of the police car was similar to her niece’s vehicle. When she became certain that the stopped vehicle was not her niece’s car, Ms. Montgomery drove away. At trial, Ms. Montgomery identified a photograph of the car as similar to the vehicle that she had seen on the morning of the homicide.
*712 Louise Filas testified that she resided on Page Drive and that her bedroom faced the street. At about 6:30 a.m to 6:45 a.m., Ms. Filas opened her bedroom drapes and observed a police unit stop a motorist. The police officer left his vehicle’s overhead lights on, and approached the motorist. Ms. Filas noticed that the motorist’s car was black and that it was parked directly in front of her window. After checking on her husband, Ms. Filas returned to her bedroom for her medication and again looked out the window. She saw the police officer attempt to handcuff the motorist. She turned her attention away for a short time, but then looked out her window for a third time. This time, she saw the police officer backing up into the middle of the street, with his hands upraised. Since the motorist was clearly in charge of the situation, Ms. Filas became alarmed and called 911. While she was on the phone with the emergency operator, Ms. Filas heard a noise |Rthat sounded like a gunshot and saw the officer’s legs buckle. At that time, the motorist ran, entered his car, and sped away toward Lake Pontchartrain. Later, Ms. Filas identified a vehicle shown to her by officers as similar to the one that she had seen from her window.
Douglas Smith testified that he and his wife were driving along West Esplanade Avenue on the morning of October 5, 1996. He noticed a police car with flashing lights on Page Drive. He also noticed that a deputy and a black man were struggling with each other with the police officer attempting to place handcuffs on him. As Mr. Smith commented to his wife, he heard a gunshot. He turned to see a black man standing over the police officer, shooting down at him. The black man shot the officer three to four times while he stood above the officer. After he shot the officer, the black man turned and ran. Mr. Smith called 911 and told the operator that the black man fled in a small silver or gray car.
Kevin Pichón, a resident of Page Drive, testified that he heard noises which sounded like gunshots at approximately 6:30 a.m. on October 5, 1996. Stunned, he and his wife ran to the front door. When Mr. Pichón opened the door, he saw flashing police lights and a police officer lying in the middle of the street. His wife immediately shut the door while Mr. Pichón called 911. After he placed the call, Mr. Pichón ran into the street as Trooper Anderson arrived on the scene. Mr. Pichón noticed the fallen deputy’s gun was missing and he saw handcuffs, casings, and a watch on the ground. Barry Groff, another resident of Page Drive, testified that he heard a loud noise on the day of the homicide. Startled, he looked out of his bedroom window, which faced the street, and observed a black vehicle speeding toward Avron Boulevard. When officers later showed him a 17vehicle, Mr. Groff told the officers that the car appeared identical to the one he had seen speeding away on the morning of the homicide.
Ms. Josephine Blackwell, another resident of Page Drive, testified that at approximately 6:45 a.m. on October 5, 1996, she pulled out of her driveway to take her dog for a walk at the lake. As she drove on Avron Boulevard, she glanced in the rear view mirror and saw headlights approaching quickly. Ms. Blackwell stopped at a stop sign on Avron Boulevard. Just then, a small, black car with only one occupant in it pulled around her and sped away. Charles W. Turner, a resident of Avron Boulevard, also witnessed the driving incident involving Ms. Blackwell. He was picking up garbage cans in front of his home when he heard four noises that he thought were firecrackers. Then suddenly, Mr. Turner heard a screeching sound and saw a black vehicle nearly collide with a light colored vehicle as the black vehicle attempted to drive around the light-colored car. Within a week, officers showed Mr. Turner a vehicle that he stated fit the description of the car he had seen speeding on the morning of the homicide. Ms. Patricia Cleary testified that she lives at *713 the córner of Avron Boulevard and Page Drive. On the date of the homicide, as Ms. Cleary attempted to go outside to pick up the newspaper at approximately 6:45 a.m., she heard noises and yelling outside her house. Ms. Cleary did not open the door, but looked through the window and saw two vehicles, one dark-colored and occupied by a black man and the other light-colored and occupied by a woman. The dark-colored car cut.in front of the light-colored car and almost caused an accident at the corner of Avron Boulevard and Page Drive. The dark-colored car sped away. At trial, Ms. Cleary identified a photograph of the vehicle as similar to the car that she saw on the morning of the | shomicide.
On the date of the homicide, Ms. Virginia Duffy was walking with a friend at approximately 6:30 a.m. When they were two or three blocks away from Page Drive, Ms. Duffy heard four gunshots. As they turned to walk on Academy Drive, a navy blue or black car sped toward them, causing them to jump to the side of the street. Ms. Duffy tried to get the vehicle’s license plate number, but the car was traveling too fast. At trial, Ms. Duffy identified the photograph of a vehicle as similar to the car that almost ran over her.
After he obtained descriptions of the suspect from witnesses of both crime scenes, Lt. Buras issued a bulletin to law enforcement agencies providing descriptions of the murder and robbery suspect as a black male, approximately five feet, seven inches tall, at about 160 -170 pounds with a slim athletic build. The suspect was described as wearing a white T-shirt and blue jeans. Several eyewitnesses stated that the suspect’s car was a small, black vehicle.
Lt. Buras showed five sets of photographic lineups to the various witnesses, but surfaced no promising suspects as of the night of the homicide. He then focused the investigation on locating documentation on the Brittania watch found at the murder scene and on a telephone call from defendant’s father, both of which ultimately led officers to suspect the defendant.
Donald Jones, testified that he lived with his son, defendant Ulysses Jones, Jr., at Windmill Creek Apartments. When Mr. Jones noticed that defendant had not come home on the night of October 4, 1996, he paged his son. Defendant arrived at the residence at 7:15 a.m. on October 5, |a1996. Later that day, Mr. Jones’s landlord told him that the description of the murderer matched that of Mr. Jones’s son. Because Mr. Jones became concerned that his son was involved in the murder, Mr. Jones asked his then-girlfriend, Charlotte Hill, to contact her friend, Officer Neville Payne, a New Orleans Police Officer, in order to obtain advice. Officer Payne spoke to Mr. Jones and advised him to take defendant to the Jefferson Parish Sheriffs Office.
On October 7, 1996, Mr. Jones placed two phone calls to the Jefferson Parish Sheriffs Office. Lt. Buras testified that a meeting was arranged with defendant later that evening at 10:00 p.m. After being advised of his constitutional rights, and waiving them, defendant was interviewed in the presence of his attorney by Major Tom Gorman and Lt. Buras. At the conclusion of the interview, defendant agreed to accompany the officers to the residence of Ms. Lawanda Wilson, whom defendant named as a witness to provide an alibi for the evening of October 5,1996. Defendant also showed the officers the residence of his sister, Ms. Lathecia Small, and the officers also brought defendant to the convenience store. They returned to the sheriffs office around 1:00 a.m., on October 8, 1996, when defendant gave a second statement to the officers.
On the morning of October 8, 1996, Lt. Buras obtained a search warrant and participated in a search of defendant’s and his father’s residence. At the apartment, officers recovered three pairs of blue jeans and $338.00 in cash from an empty box inside a closet in the front living room in *714 the apartment.[1] Mr. Jones did not know that there was money in the closet. Lt. Buras learned that the only people with access to the closet were |indefendant, defendant’s father, and Ms. Small.
Detective Mike Dauth searched the outdoor area of the apartment complex and found a full, unopened bottle of Crazy Horse malt liquor wrapped in a plastic convenience bag, and concealed by a large leaf in a flowerbed directly beneath the front door of the defendant’s upstairs apartment. Lt. Buras testified that Officer Anthony Flaherty searched the drainage canal opposite the apartment and located a plastic bag that contained Deputy Clarius’s assigned weapon. Officers also seized a black, four-door Metro Chevy GEO registered to Lathecia Small. The vehicle was later towed to the scenes of the robbery and the homicide for the purpose of identification. The robbery and homicide witnesses identified the car as similar to the vehicle driven by the perpetrator of each crime.
On the afternoon of October 7, 1996, Lt. Buras was notified that documentation had been located to link the “Brittania” watch to the defendant. Detective Mark Berg-gren discovered paperwork, dated July 21, 1996, linking the Brittania watch to the defendant.
Mr. David Tircuit, Ms. Hill’s brother, assisted Ms. Hill’s son, Tyson, in selecting a birthday present for Mr. Jones. While in a drug store, he noticed a Brittania commemorative coin watch similar to one that he had seen as a child. The Brittania watch was made from a fifty-cent coin. It was silver with gold filling on its face, and the actual Lady Liberty was also gold. Mr. Tircuit identified the Brittania watch seized at the scene as similar to the one that he had purchased for Mr. Jones’s birthday present. The watch was also identified as similar to the one that Ms. Hill’s son, Tyson, gave defendant’s father by Ms. Hill and Shannon Tuggles, the mother of two of the defendant’s sons.
| n Defendant did not testify at trial, however, the State played his taped statements for the jury. In his statements, defendant denied killing Deputy Clarius. Defendant stated that, on October 4, 1996, he arrived home from work between 6:00 p.m. or 7:00 p.m. At around 9:00 p.m., he and his sister, Lathecia Small, left his house and visited his cousins. At about 10:30 p.m. or 11:00 p.m., he and Ms. Small went to Ms. Lawanda Wilson’s house and stayed there until about 12:15 a.m. Defendant left Ms. Wilson’s residence to bring his sister home. Afterwards, defendant returned to Ms. Wilson’s house. At about 5:45 a.m. in the morning, defendant and Ms. Wilson left her house and went to Anita’s Restaurant on Tulane Avenue and Galvez Street. They were at Anita’s Restaurant for about 20 minutes. As he parked his car, defendant saw his uncle, Van Small, outside of the restaurant waiting for a bus to go to work. While heading back to Ms. Wilson’s house, defendant received a page from Mr. Jones. Defendant called his father and was told that he had to come home. Defendant brought Ms. Wilson home and returned to his father’s apartment. When defendant returned home, Ms. Small was on the phone with her then-boyfriend Officer Keith Seals. Defendant spoke to Officer Seals and called his girlfriend before going to sleep. Defendant stated that he wore a blue and white Reebok-lettered short-sleeved shirt and blue jeans while he was with Ms. Wilson. Defendant also drove his sister’s GEO Metro on that night, but he denied owning a Lady Liberty coin watch.
The version of the events on the evening of October 4, 1996 and early morning of October 5, 1996 was contradicted by the testimony of Ms. Wilson and Van Small. While Ms. Wilson testified that defendant and Ms. Small did visit her on the evening of October 4, 1996, she denied that he 11?.brought Ms. Small home and returned to *715 her house. Ms. Wilson maintained that defendant and Ms. Small left her house at about 12:30 to 1:00 a.m. and that neither of them returned to her house. Ms. Wilson explicitly denied that she was with defendant at about 5:45 a.m., or that she went to Anita’s Restaurant with the defendant that morning.
Van Small testified that on October 5, 1996, he took a bus to go to work at approximately 5:30 a.m. When he exited the bus at Tulane Avenue and Broad Street shortly after 6:00 a.m., he saw defendant in Ms. Small’s black GEO Metro. When Mr. Small stopped and spoke to defendant, defendant told him that he had been out. Defendant had a bottle of beer between his legs and no one was in the car with him. Van Small was on his way to work, and only spoke to defendant for about five to ten minutes.
ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues the trial court erred in denying him a mistrial because the State did not give the required notice of its intent to use oral statements made by defendant to Officer Keith Seals. Defendant contends that the State referred to those statements during the opening and closing argument, and during the examination of Officer Seals and Ms. Small, even though the trial court had ruled those statements inadmissible. The State responds that the defense knew about the statements because it interviewed Officer Seals; and therefore, defendant cannot show that he was prejudiced by the State’s failure to provide notice.
On December 2, 1996, defendant filed a Motion for Discovery, which sought the disclosure of any oral confession or statement that defendant allegedly made and that the State intended to offer into evidence. On December 3, 1996, the defendant filed a motion for discovery which ^^specifically requested the disclosure of “any oral confessions or statement of any nature made by the defendant”, intended for use at trial, “with the information as to when, where and to whom such oral confession or statements were made.” On April 23, 1999, the State filed a Notice of Intent to Use and Introduce the Statements that defendant made to Major Gor-man and Lt. Buras on the evening of October 7, 1996, and the morning of October 8, 1996. However, the State did not notify defendant of its intent to use the statements defendant made to Officer Keith Seals on the morning of October 5, 1996.
OPENING STATEMENT
LSA-C.Cr.P. art. 767 states:
The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has been previously ruled admissible in the case.
Notwithstanding, during opening statements, the prosecutor said:
“You’re going to find out from a Ken-ner Police Officer by the name of Keith Seals, that the defendant’s sister used to date Keith Seals, or at the time was still dating Keith Seals ... Keith Seals was working the jail at Kenner that morning. At about a few minutes after seven, 7:15, there’s a phone call to the jail. A lady answers the phone at the jail, tells Keith he’s got a phone call, but he doesn’t hear her. A few minutes later, the phone rings again. Tell Keith that his mama’s been involved in an accident and he needs to come to the phone. Keith comes to the phone. The defendant is on the phone. Keith Seals’s mother has not been involved in an accident. And Keith says, why did you tell me that my mother had been involved in an accident? Well, I needed to get you on the phone. Well, what do you need? And why are there so many police cars in the area? Why are there so many police cars running around here? Keith said, man, I don’t know what you’re talking about. He says I’ll try to find out and *716 he hangs up. Now what Keith Seals is going to tell you, is that never in the time that he knew the defendant or the defendant’s sister, had they ever called him and asked him about any situation in law enforcement... .[W]hen he got home, he got another phone call. This time from the defendant’s sister. Man, do you know what’s going on? He says, I think there was a Jefferson Parish deputy that was shot. Well, do they know who did it? Do they have any leads? Do they have any suspects? |14He says, I don’t know anything. That’s within minutes of the defendant arriving back at his apartment.”
After opening argument, defendant objected to the introduction of defendant’s statements to Officer Seals because he did not receive notice of intent under LSA-C.Cr.P. art. 716(B).[2] The trial court sustained the objection, and ruled that the defendant’s statements to Officer Seals were inadmissible. However, defendant did not move for a mistrial on the basis that the State mentioned the statements defendant made to Officer Seals in its opening argument until after six of the State’s witnesses testified and before Officer Seals testified. A motion for mistrial is timely when that motion is made upon conclusion of the opening argument. State v. Cooks, 97-0999 (La.9/9/98), 720 So.2d 637, 642. In this case, defendant did not make a timely motion for mistrial after the conclusion of the State’s opening statement. Therefore, the trial court did not abuse its discretion in denying Defendant’s Motion for Mistrial.
TESTIMONY OP LATHECIA SMALL AND OFFICER KEITH SEALS
The defendant next argues that the State elicited impermissible testimony from defendant’s sister, Lathecia Small, and Ms. Small’s then-boyfriend, Kenner Police Officer Keith Seals, regarding defendant’s statements to Officer Keith Seals indicating an interest in the homicide investigation. During Ms. Small’s testimony, she stated she had received a phone call from Officer Seals on the evening before the homicide. Ms. Small | ^wanted to return the phone call; however, it was her personal preference not to call Officer Seals at work. Ms. Small testified that she asked defendant to return the call to Officer Seals at work. Defendant had previously spoken to Officer Seals on the phone, however, defendant had never called him. Ms. Small did not know the substance of defendant’s conversation with Officer Seals. Also, Ms. Small testified that she did not remember talking to Officer Seals about the number of police cars in the neighborhood or the investigation of Deputy Clarius’s murder later that evening. When defendant did object to the State’s questions, the trial court sustained the objection. However, defendant made a motion for a mistrial after Ms. Small’s testimony based on the mention of defendant’s telephone call with Officer Seals and the State’s reference to that telephone call during its opening argument. The trial court denied defendant’s motion.
After Ms. Small testified, the trial court held a bench conference to discuss Officer Seals’s testimony. During this bench conference, the trial court cautioned the State to be careful regarding the scope of its direct examination of Officer Seals. Officer Seals testified that he dated Ms. Small casually. He further testified that defendant called him on October 5, 1996, and that defendant had never called him at work before. Officer Seals further testified that Ms. Small also called him later that day and asked him if he knew anything about the murder of the deputy because the defendant wanted to know about *717 it. Officer Seals recalled that it was not unusual that Ms. Small called him at work. The defendant did not object during Officer Seals’s testimony, however, he later moved for a mistrial on the basis that Officer Seals testified that Ms. Small told him that defendant was interested in the information regarding the homicide. The trial court denied Defendant’s 11fiMotion for a Mistrial.
We note that the defendant did not contemporaneously object to the questions that the State posed to Officer Seals. According to LSA-C.Cr.P. art. 841(A), an issue is not preserved for appellate review absent a contemporaneous objection. However, we note that the trial court had previously ruled the statements made by defendant to Officer Keith Seals inadmissible. The appellate court must review the record to determine whether any prejudice which may have resulted from the State’s non-compliance with a discovery procedure caused the trier of fact to reach the wrong conclusion. State v. Ray, 423 So.2d 1116, 1118-1119 (La.1982).
In State v. Phillips, 94-673 (La.App. 5 Cir. 3/1/95), 659 So.2d 785, 790, this Court explained that:
The purpose of the notice is to avoid surprise and to allow fair opportunity to plan or present a defense in light of the damaging statement. State v. Billiot, 421 So.2d 864 (La.1982). An “inculpato-ry statement” within the meaning of this article refers to an out of court admission of incriminating facts made by the defendant after the crime has been committed and an incriminating statement is one which admits a fact tending to establish guilt, or from which guilt may be inferred. Improper introduction of in-culpatory statements mandates reversal only if the accused is prejudiced by failure to disclose. State v. Grant, 517 So.2d 1151 (La.App. 5th Cir.1987).
In State v. Ballay, 99-906 (La.App. 5 Cir. 2/29/00), 757 So.2d 115, 126, this Court stated:
Mistrial is a drastic remedy and, except in instances in which mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. State v. Smith, 433 So.2d 688, 696 (La.1983). Whether a mistrial should be granted is within the sound discretion of the trial court, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. State v. Brown, 96-1002 (La.App. 5 Cir. 4/9/97), 694 So.2d 435, 439, writ denied, 97-1310 (La.10/31/97), 703 So.2d 19.
This Court further explained in Ballay, 757 So.2d at 126:
La. C.Cr.P. art. 716 obligates the State, on defense motion, to produce any statements or confessions made by the defendant in connection with the case that are within the possession or knowledge of the prosecutor, and that are intended for use at trial. In the event of a discovery violation, the court has the discretion to permit the discovery of the undisclosed material, order a mistrial, grant a continuance, prohibit the introduction of the undisclosed material, or any other, except dismissal, that is appropriate pursuant to La. C.Cr.P. art. 729.5.
LSA-C.Cr.P. art. 729.5 states in pertinent part:
A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
B. In addition to the sanctions authorized in Part A hereof, if at any *718 time prior or subsequent to final disposition the court finds that either the state through the district attorney or assistant district attorney or the defendant or his counsel has willfully failed to comply with this Chapter or with an order issued pursuant to this Chapter, such failure shall be deemed to be a constructive contempt of court.
Defendant argues that he was prejudiced since his theory of the case was destroyed by the introduction of defendant’s statement to Officer Seals indicating that he had an interest in the homicide investigation and that he was deprived of the full understanding of the strength of the State’s case. Although defendant alleges that he was surprised, he does not' show how he could have prepared his defense differently had he been given notice of the statements. See State v. Ratcliff, 98-101 (La.App. 5 Cir. 2/23/99), 731 So.2d 356, 363, writ denied, 99-1112 (La.9/3/99), 747 So.2d 541.
The defendant himself, in his statement to police officers two days after the homicide investigation, stated that he had spoken to Officer Seals on the morning after Deputy Clarius’s murder, and that he was aware on the |1smorning of the homicide that Ms. Small was talking to Officer Seals. Defendant also stated that various people thought that he was involved with Deputy Clarius’s murder. Furthermore, the defendant’s father was concerned that his son was involved in the homicide and asked his then-girlfriend, Ms. Hill, to contact a friend of hers who worked in the New Orleans Police Department so that he could obtain advice on what he could do to help his son. Finally, independent evidence linked the defendant to the Brit-tania watch that was retrieved at the scene. Therefore, the statements of Officer Seals, while arguably inadmissible, were merely cumulative evidence since there was sufficient evidence demonstrating that defendant was concerned with the homicide investigation. Thus, Officer Seals’s testimony, while inadmissible, was harmless error and the trial court did not abuse its discretion in denying Defendant’s Motion for a Mistrial. Ray, 423 So.2d at 1118-1119; LSA-C.Cr.P. art. 841(A).
CLOSING STATEMENT
During rebuttal closing arguments, the State argued that:
How many of them made phone calls and had other people make phone calls to Police Officer Keith Seals? How many of them had their sister call Keith Seals to find out if they had any suspects in the murder ...
Defense counsel did not object to the statement during the closing argument, but instead objected after the trial court read the jury charge and the jury had retired to deliberate. We note that the trial court’s jury charge included an instruction that opening and closing statements were not to be considered as evidence.
The defense did not object that this statement was improper after closing argument; therefore, the claimed error has not been preserved for appeal. State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 374-375, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996). Moreover, even if the remarks were improper, if this Court is not “firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict,” then the remarks do not require reversal. State v. Taylor, 669 So.2d at 375 (quoting, State v. Bates, 495 So.2d 1262, 1273 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987)). Given the evidence presented at trial supporting the defendant’s guilt, the defendant cannot show that this brief comment influenced the jury and improperly contributed to the verdict. We find that the trial court did not abuse its discretion in denying Defendant’s Motion for a Mistrial. This assignment lacks merit.
*719 ASSIGNMENT OF ERROR NUMBER TWO
The defendant argues that the State’s repeated introduction of hearsay evidence contrary to the ruling of the trial court rendered defendant’s trial so fundamentally unfair as to warrant reversal. Defendant specifically objects to Lt. Bu-ras’s testimony referring to hearsay statements linking the defendant to the watch found at the murder scene and undermining defendant’s alibi. Defendant further argues that the State deliberately attempted to violate the trial court’s rulings in order to prejudice the rights of the defendant. The State responds that the trial court sustained defendant’s objections and that even if the hearsay statements were improperly admitted any error is harmless because the testimony is cumulative to other evidence in the record.
Lt. Buras testified that throughout the investigation his efforts did not lead to any suspect other than defendant. In response to defense counsel’s questions during cross-examination, Lt. Buras testified that Mr. Horace | ¡>nPorter and Mr. Derrick Friloux were interviewed by investigators. On re-direct, the State asked Lt. Buras the substance of Mr. Porter’s statement regarding the watch. Defense counsel timely objected on the basis of hearsay, and the trial court sustained the objection. The State then asked Lt. Buras whether the Brittania watch was linked to defendant after Lt. Buras spoke to Mr. Porter, and Lt. Buras responded that it was. After Lt. Buras responded, defense counsel objected on the basis that the statement is hearsay. The trial court did not rule on the objection, however, the State did not further pursue this line of questioning. Next, Lt. Buras was asked by the State if Mr. Friloux confirmed defendant’s whereabouts on the evening of Deputy Clarius’s murder. Defense counsel objected and the trial judge sustained the objection. The State did not further pursue that line of questioning.
The record reflects that defense counsel timely objected to the State’s question regarding whether Mr. Friloux’s statement undermined defendant’s alibi; therefore, this issue is moot. The trial court also sustained defense counsel’s objection to the State’s question posed to Lt. Buras concerning Mr. Porter’s statements linking the defendant to the Brittania watch found at the homicide scene. The record reflects that Lt. Buras answered the question regarding the linkage to the Brittania watch before the defense counsel objected. A contemporaneous objection is necessary to preserve the issue for appellate review. LSA-C.Cr.P. art. 841(A). An objection made after the evidence is before the jury comes too late. State v. Bretz, 394 So.2d 245, 251 (La.1981), cert. denied, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); State v. Thompson, 569 So.2d 593, 595 (La.App. 2d Cir.1990), writ denied, 592 So.2d 1314 (La.1992). Furthermore, the record | ^reflects that the State did not violate the trial court’s rulings and prejudice the defendant’s right to a fair trial. LSA-C.Cr.P. art. 771, 775. This assignment lacks merit.
ERRORS PATENT DISCUSSION
The record in this case was reviewed for errors patents in accordance with LSA-C.Cr. P. art. 920 and State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Wetland, 556 So.2d 175 (La.App. 5 Cir.1990).
The trial court failed to inform defendant of the prescriptive period for post-conviction relief as mandated by the amended version of LSA-C.Cr.P. art. 930.8. LSA-C.Cr.P. art. 930.8 provides, in pertinent part:
A. No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922, unless any of the following apply:
[[Image here]]
*720 [[Image here]]
(8) The application would already be barred by the provisions of this Article, but the application is filed on or before October 1, 2001, and the date on which the application was filed is within three years after the judgment of conviction and sentence has become final.
The application of the amended prescriptive period in defendant’s case would not violate ex post facto prohibitions, as the article itself does not relate to an offense or its punishment. See State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189, 1201. Therefore, we hereby order the district court to send written notice of the amended prescriptive period (along with an advisal of when the period begins to run) to defendant within ten days of the rendering of this opinion, then to file written proof in |?,?the record that defendant received said notice. State v. Stelly, 98-678 (La.App. 5 Cir. 12/16/98), 726 So.2d 662, 564.
Accordingly, we hereby affirm defendant’s conviction and sentence. We order the trial court to send written notice of the prescriptive period for post-conviction relief to defendant within ten days of the rendering of this Court’s opinion, in accordance with LSA-C.Cr.P. art. 980.8, and to file written proof in the record that defendant received such notice.
AFFIRMED AND REMANDED WITH ORDER.

. Lt. Buras testified that $319.00 was stolen from the E-Z Serve.

. C.Cr.P. art. 716 states, in pertinent part:
B. Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.