MARION F. EDWARDS, Chief Judge.
| jJDefendant/appellant, Arielle Smith (“Smith”), appeals her conviction for second degree murder, a violation of La. R.S. 14:30.1. Following trial and her conviction by a unanimous jury, Smith was sentenced to life in prison at hard labor without benefit of parole, probation, or suspension of sentence. This appeal follows.
*1117 Prior to the trial of this matter, the court conducted a competency hearing following which Smith was found competent to stand trial. Later, another hearing was held by a sanity commission to determine Smith’s state of mind at the time of the murder. Dr. Richard Richoux testified that Smith had the capacity to distinguish right from wrong at the time of the offense.
At approximately 10:45 a.m. on September 11, 2008, Brandy Dozier, the mother of the infant victim, dropped off her two sons to Smith’s house in Harvey. Smith would babysit the children while Ms. Dozier went to work for her 11:00 a.m. shift at the Common Grounds coffee shop in Gretna. At the time, Ms. Dozier had known Smith, who was her brother’s girlfriend, for about three years and the two often babysat each other’s children. That day, in addition to watching Ms. Dozier’s two children, Smith was also watching her own son, who was a one year |sold at the time. Soon after arriving at work, at 11:07 a.m., Ms. Dozier received a call from Smith who was crying and saying she did not know what happened. Ms. Dozier told Smith to call the police and rushed back to the house. When she arrived, she observed the victim lying on the floor not breathing. Ms. Dozier grabbed the phone from Smith, who was talking with a 911 operator, and followed the operator’s instructions in an attempt to resuscitate the infant. Moments later, firefighters arrived on the scene and took over the resuscitation efforts, which were subsequently taken over by paramedics.
Ms. Dozier noticed there were marks all over his body that had not been there earlier. However, he was not wet. Smith told her she did not know what happened, and she later told Ms. Dozier that she was sorry. Prior to that date, Ms. Dozier had not seen Smith harm the children nor were there unexplained injuries.
One of the first responders, Deputy Fire Chief Ted Ward, arrived around 11:15 a.m. He saw a small child on the living room floor who appeared to have suffered burns. While Chief Robertson had begun CPR, Chief Ward tried to find out what happened. He saw Smith, who was upset but not hysterical or crying. She told him several times that she did not know what happened to the baby. Chief Ward assessed the kitchen and the area around the stove, which was close to the victim’s head, and did not see anything on the stove or anything that could have fallen off the stove — no pots or water. Testimony from several other witnesses on the scene also established that no pots were on the stove, in the oven, or on the ground; the stove was not hot, and water was not found anywhere throughout the residence. Additionally, the victim’s clothing was dry, and one of the responding paramedics, Randy Williams, testified that the victim’s burns were not consistent with those caused by a spill of boiling water. Williams also observed bruising on the victim.
|4Detective Melvin Francis initially responded to the 911 call and asked Smith what happened, but Smith replied she did not know and never gave any information. Soon after the victim was declared dead, the Homicide Division of the Jefferson Parish Sheriffs Office was dispatched to the scene. Detective Francis stayed after homicide arrived, and he was present when the clothes dryer, along with other possible heat sources, was inspected.
Detective Keith Locascio of homicide investigated the scene, taking photographs and measurements. There was no evidence of anything heating on the stove, and no obvious source of heat that may have caused the injuries. The dryer was measured and examined, revealing a blood product on one of the blades. A white *1118 towel in the outside garbage contained blood and skin tissue.
One of the homicide officers, Detective Donald Clogher, arrived on the scene and spoke with Smith to find out what had happened. She was seated in the backseat of a police car, but the victim’s death had not yet been determined to be a homicide, and Smith was not a suspect. At that time, Smith was emotional and crying. Detective Clogher testified that Smith told him that the victim had overturned a pot of boiling water from atop the stove, and, when she discovered the baby, he was in distress. The investigation then turned to validating Smith’s story. Detective Clo-gher found no pots or water on the stove, and there was no indication of heated water elsewhere in the residence.
After it was determined that Smith’s story was inconsistent with the scene, Detective Clogher advised her of her rights, which she indicated she understood by nodding and a verbal affirmation. Smith was then transported to the Detective Bureau to be questioned further regarding the inconsistencies between her story and the scene. Detective Clogher testified that, at the bureau, Smith was not crying, but “was still obviously upset.” Before commencing the interview, the |5detective again informed Smith of her rights, this time with the aid of a Rights of Arrestee form. After being read her rights, at 1:20 p.m., Smith placed her initials next to each individual right and signed the form. She also signed the Waiver of Rights portion of the form. Thereafter, she gave three taped statements.
Smith’s first statement commenced at 1:49 p.m. and concluded at 2:11 p.m. At the beginning of this statement, the detective recapped her execution of the Rights of Arrestee form, read Smith her rights again, and she again agreed to give a statement. In this statement, Smith stated that, after the children were dropped off, she took the baby out of the car seat and sat him next to her on the sofa. After a while, she picked the baby up and was heating water on the stove to make mashed potatoes. While the water was heating up, she let the children play in the kitchen while she sat on the sofa watching television. Smith dozed off and was then awakened by her son crying. She gave him his juice bottle, which calmed him, and then she went back to sleep on the sofa and was awakened again by the victim’s brother screaming. When she went into the kitchen, she found the victim lying on the floor, not breathing with his face blue and the skin on his nose peeling. She stated that she did not know what had happened. She attempted CPR on the victim, called her boyfriend, called the victim’s mother, and then called 911. Smith also stated that she picked up and put away the pot that had fallen to the floor and turned off the stove. She stated that the victim was wet so she used a white towel to wipe him dry, which she then put in the dryer.
Prior to the taking of her second statement, Detective Clogher learned that the dryer was involved in the infant’s death. The second taped statement commenced at 2:34 p.m. and concluded at 2:45 p.m. At the beginning of this statement, she was reminded of her rights, which she indicated she remembered and understood, and she stated she was willing to talk. In this statement, Smith | (¡stated that the victim was in the dryer. She was playing hide and go seek with the children, removed clothes from the dryer, put the victim in there, and went to the living room to pause the television. She looked at the television “for a second” and then paused it. Sometimes the dryer goes on by itself. She was only gone a couple of seconds. When she returned to the dryer, she realized it was on, opened it, and removed the victim. When she noticed that he was not breath *1119 ing, she attempted CPR, called her boyfriend, called the victim’s mother, and then called 911. While on the phone, she put the clothes back in the dryer along with a white towel she had used to hold the victim.
Smith’s third taped statement commenced at 3:11 p.m. and concluded at 8:17 p.m. At the beginning of this statement, she was again reminded of her rights, which she indicated she understood, and she stated she was still willing to talk. In this statement, she stated that the children were screaming and running around and the victim started crying. She took clothes out of the dryer, placed the victim in the dryer, and turned it on because she thought it would keep him quiet. She returned to watching television for a “minute or so,” heard somebody screaming, paused the television, realized that the screaming was not coming from the two other children, and then went to check on the victim in the dryer. When she went into the room where the dryer was located, the screaming had stopped; she opened the dryer door and discovered that the victim’s skin was peeling. During the statements, Smith became emotional, and sometimes did cry.
Detective Clogher testified that a white towel, with what appeared to be blood and skin, was discovered in the garbage can outside the home.
Detective Donald Meunier participated in taking the statements. There was no force or coercion used when Smith made her statements. During her ] 7statements, she was consistently quite upset, although she did not seem frightened. However, she was given time to compose herself.
Daniella Blandón, formerly a DNA technician, was qualified as an expert in serology. She testified that she tested several pieces of evidence such as swabs from the dryer, fabric, and clothing. She confirmed the presence of human blood on the white towel, a baby shirt, and baby pants obtained from the interior of the dryer.
Adriana Perez testified as an expert DNA analyst for Jefferson Parish. She compared the blood sample from the infant victim to samples forwarded by Blandón. The tissue and blood samples she analyzed were consistent with the reference sample from the victim.
During trial, counsel for Smith requested another competency hearing, which the court deferred. The following day, while Smith was present in court, the court called Cynthia Lachney. Lachney was a nurse who worked at the Jefferson Parish Correctional Facility, and she testified that Smith had been brought into the medical clinic after they received a report that Smith had passed out or swallowed mouthwash. At that time, she was alert but not speaking. Her vital signs were normal. Following this testimony, the court addressed Smith and warned her that her disruptive behavior would not be tolerated and that it was his observation that she was attempting to delay the trial.
Jeremy Hoffpauir, a forensic engineer, testified as an expert in mechanical engineering. He tested Smith’s dryer, which was on the automatic regular setting when first found. He was asked to determine the temperature of the drum, of the air, and body temperature the infant would have reached. To attempt to replicate the facts, it was decided that a turkey was a reasonable representation of the skin, tissue, and bone involved. It was determined that the force of gravity exerted on |8the turkey would have been about 50 pounds. The resulting report concluded that the air temperature on the inside of the dryer was 164.5 degrees Fahrenheit after one minute and 192.4 degrees after three and one-half minutes. A video of the test was introduced into evidence.
*1120 Dr. Karen Ross, assistant coroner and forensic pathologist, examined the body of the victim and prepared an autopsy report, She discussed the details of the injuries found and concluded the cause of death was multiple blunt force injuries with cranium cerebral trauma associated with thermal injuries.
The defense presented no witnesses.
In her first assignment of error, Smith contends that her statements were not free and voluntary because of her emotional state and the use of improper questioning techniques [sic] by the police. She urges, therefore, that the trial court erred in denying the motion to suppress her statements.
With regard to her emotional state, Smith refers to the shock and distress she was experiencing in the immediate aftermath of the victim’s death. She states that she was placed in a police car within a few minutes of the arrival of police, and she was not allowed to speak to anyone before she was taken in for questioning. She further urges that all officers agreed she was very upset and sometimes non-responsive, and nothing was done to ascertain her mental condition or to insure that she understood her rights. She claims that the questions during the interview were leading, some were repeated, and some went unanswered. As to her mental condition, she refers to the examining doctors’ observation during her competency hearing that she showed signs of detachment from reality when she thought she would be released from jail. She also points to her abnormal behavior in the courtroom and her apparent suicide attempt while in custody. During the direct | examination of Joseph Maher, her boyfriend, Smith prostrated herself on the courtroom floor.
Trial courts are vested with great discretion when ruling on a motion to suppress.[1] Thus, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion. Also, a trial court’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the defendant’s confession are accorded great weight and will not be disturbed unless they are not supported by the evidence.[2] In reviewing a trial court’s ruling on a pretrial motion to suppress, an appellate court may review the testimony adduced at trial, in addition to the testimony adduced at the suppression hearing.[3]
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[4] rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises.[5] A determination as to voluntariness of a statement is made on a case-by-ease basis and *1121 is based upon a “totality of the circumstances.” [6]
In the instant case, because Smith’s statements were offered while she was in custody, the first issue to be addressed is whether she was adequately advised of her constitutional rights.
The record shows that Smith was advised of her rights at the scene and multiple times at the detective bureau. At the bureau, she was advised of her |inrights, along with the Rights of Arrestee form, which she initialed and signed. She also signed the waiver of rights portion of the form, indicating her waiver of rights. Furthermore, this form, her understanding of her rights, and her willingness to give a statement were all referenced and reconfirmed at the beginning of each of her three taped statements. Under these circumstances, Smith was properly advised of her constitutional rights.[7]
Next, we consider whether Smith’s waiver of those rights was intelligent and voluntary. The critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement.[8] Here, Smith signed the waiver of rights form prior to giving her recorded statements. On the form, as well as verbally, she indicated that she understood her rights, that she was willing to answer questions without a lawyer, and that she had not been threatened or induced to waive her rights. At the beginning of her first statement, the detective reiterated the waiver of rights portion of the form, stating:
And then there is the Waiver of Rights. It says I understand what my rights are. I’m willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. Is that your signature below that?
Smith replied, “Yes.” Detective: “And are you in fact willing to give us a statement right now?” Smith: ‘Tes.” Detective: ‘Tou’re ready to talk about it again?” Smith: ‘Tes.” Furthermore, at the hearing on the motion to suppress, the detective was asked on cross-examination, “So, how can you convince this Court that Ms. Smith actually understood her rights and actively waived those rights?” The detective replied, “Well, just by being emotional she was very clear of mind. I lnmean, she did understand what was transpiring. She did understand what was being read to her and she acknowledged that accordingly on several occasions.”
Lastly, it is worth noting that, prior to Smith’s second and third statements, she was not read her rights again, although she was reminded of them and indicated she understood them and was still willing to talk. The failure to ve-Mirandize Smith prior to her second and third statements is of no consequence since this Court has recognized that Miranda warnings are not required before each and every statement.[9] In light of the foregoing, *1122 we find that Smith’s waiver of her rights was intelligent and voluntary.
Next, we address whether Smith’s statements were made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises. Smith contends that her distressed emotional state during the statements, her limited mental state evidenced by her bizarre behavior throughout trial, and the manner in which her statements were obtained rendered her statements involuntary.
In regard to her distressed emotional state, this Court addressed a similar scenario in State v. Terrick.[10] There, a sixteen-year-old boy was convicted of second degree murder and argued on appeal that his statement to police was not given knowingly and voluntarily. The detective testified that the defendant appeared upset during the statement and that he cried following the statement. Although this Court’s focus was on the effect of the defendant’s age on the voluntariness of his statement, this Court still took note of his distress, stating: “Defendant, who was apparently upset by the circumstances in which he found | ^himself, at no time sought to discontinue the statement.” We concluded that his statement was freely and voluntarily given.[11]
In the instant case, although Smith was upset and cried intermittently throughout her statements, a review of the transcript reveals no indication that she wished to stop talking. In addition, the interviewing detective in the present ease testified that Smith was of clear mind and that she understood what was transpiring. This is further corroborated by a review of the cassette tapes, in which Smith’s statements appear voluntary and devoid of any invocation of her rights. Consequently, we find that Smith’s distressed, emotional state did not render her statements involuntary.
Next, in regard to Smith’s alleged limited mental state, this Court has recognized that a diminished intellectual capacity does not, alone, vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession.[12] The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement.[13] We have found hereinabove that Smith was able to understand her rights and voluntarily gave the statements. Importantly, we note that a competency hearing was conducted in which the trial court found Smith competent to stand trial. In the medical report upon which the trial court’s finding was based, the doctors concluded that Smith did not suffer from a psychiatric disorder. Smith’s alleged limited mental capacity did not render her statements involuntary.
Turning now to the claim that her statements were rendered involuntary by the manner in which her statements were obtained, it is well established that the determination as to voluntariness of a statement is based upon a “totality of the | ^circumstances.”[14] The totality of the circumstances in the instant case indicates that Smith’s statements were voluntary. She was advised of her rights multiple times and was reminded of her rights prior to each statement. She indicated she un *1123 derstood and wished to waive her rights by initialing and signing the rights of arrestee form as well as by verbal affirmations. The manner in which the interrogation was conducted did not include any coercive tactics. The duration of the interrogation was not long. From the time she was initially read her rights until her third statement was concluded, a total time of 1 hour and 57 minutes elapsed. She was not deprived of or denied anything. Detective Clogher testified that he asked Smith throughout the questioning “if there was anything that she needed” and, at the conclusion of her third statement, she requested a meal from McDonald’s, with which she was provided and which she ate. We do not find that the detectives pressured Smith into answering questions. A review of the cassette reveals that the detectives repeatedly acknowledged that Smith was upset and paused for her to regain her composure. They spoke to her in a calm, conversational tone and never raised their voices. Overall, she was treated courteously and the atmosphere was not coercive. Thus, in view of the fact that a trial court’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of a defendant’s confession are accorded great weight and will not be disturbed unless unsupported by the evidence,[15] we find that the totality of the circumstances indicates that the evidence supported the trial court’s finding that Smith’s statements were given freely and voluntarily. This assignment of error is without merit.
114Smith also urges that the trial court erred by not granting a mistrial when other crimes evidence was wrongfully introduced. Specifically, Smith contends that the testimony indicating that she had placed the victim in the dryer on prior occasions without turning it on constituted inadmissible other crimes evidence.
In the instant case, the fact that Smith had placed the victim in the dryer on previous occasions was first referenced during the direct examination of Detective Keith Locascio without any objection from the defense. At that time, the detective testified that Smith admitted she had done so as “a time-out.” The incident or incidents were then referenced again during the direct examination of Detective Donald Clogher. However, it was not until after the prosecutor asked ten additional questions regarding Smith’s third statement, and after that statement was played to the jury, that defense counsel lodged an objection and moved for a mistrial.
La.C.Cr.P. art. 841(A) provides: “An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” This Court has held that to preserve the right to seek appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection.[16] An objection made after the evidence is before the jury is too late.[17]
In the present case, the defense’s objection to the evidence came too late. There was never an objection to Detective Locas-cio’s reference, and the objection to Detective Clogher’s testimony was not contemporaneous as it came after the prosecutor had asked ten more questions and Smith’s *1124 third statement had been played to the jury. Certainly, the objection was made after the evidence was before l1sthe jury. Pursuant to La.C.Cr.P. art. 841(A), Smith is precluded from raising this issue on appeal.[18]
In her third assignment of error, Smith argues that the videotape of an experiment using a turkey in the same dryer in which the victim was killed was prejudicial and irrelevant because the experiment did not accurately represent the conditions that existed during the victim’s death. The State argues that the experiment was relevant because the turkey was depictive of the victim’s body and, as such, facilitated the illustration of the victim’s death. The State contends that the experiment was an effective and probative way to illustrate to the jury how the injuries were inflicted on the victim because it bore a rational connection to the facts the State had to prove, namely, Smith’s actions that comprised the elements of the offense.
In considering whether demonstrative evidence is admissible over an objection that it is unduly inflammatory, the test to be applied is whether the proffered evidence is relevant to any material issue in dispute, and if so, whether its probative value exceeds its probable prejudicial effect.[19] With some exceptions, all relevant evidence is admissible at trial. La. C.E. art. 402. “Relevant evidence” is that which tends “to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” La. C.E. art. 401.
The Louisiana Supreme Court has considered the relevance and admissibility of demonstrative evidence in several cases. In State v. Brumfield,[20] the State’s theory of the case was that a mail slot was used by the defendant and his partners to sight the victim as he came to the front door and permit them to |indischarge their gun into the door so that the shot would strike the victim. The mailbox had been removed, but the expert photographer reconstructed the scene as it existed on the night of the slaying by reinserting the mailbox and taking pictures through it. Although the photos were ruled inadmissible, the expert was questioned whether he had an opportunity to look through the mail slot after it was replaced. In finding no grounds for a mistrial after his testimony, the court determined the photographs were, relevant, stating:
Moreover, the State’s attempt to reconstruct the scene of the crime and establish that fact, by Bombet’s testimony and the photographs, would ordinarily be permissible. The probative value of such an experiment or reconstructed evidence depends in large meassure[sic] upon the extent to which the reconstructed scene was identical with or similar to that which existed at the time of the happening. McCormick, Evidence, 485 (Cleary ed.1972). Thus, such evidence is not invariably inadmissible. Its admissibility should depend upon the accuracy of the reconstruction established as a predicate.[21]
The Louisiana Supreme Court has also considered the admissibility of demonstrative videotape evidence that attempts to re-create a crime.[22] In finding one such video inadmissible, the court noted that it had no probative value since it did not *1125 depict the parties in an identical or similar manner to the incident. The court noted the defense’s argument that the State could have pointed out the inaccuracy during cross-examination. In disagreeing with this position, the court stated:
The often quoted maxim “a picture is worth a thousand words” applies to the present case. The strong impact of seeing an inaccurate reenactment creates such a substantial possibility of prejudice that it is unlikely cross-examination could effectively point out the discrepancies. As noted in McCormick on Evidence, § 214 (2d ed.1972):
The extreme vividness and persuasiveness of motion pictures, however, is a two-edged sword. If the film does not portray original facts in controversy, but rather represents a staged reproduction of one party’s version of |17those facts, the danger that the jury may confuse art with reality is particularly great. Further, the vivid impressions on the trier of fact created by the viewing of the motion pictures will be particularly difficult to limit or, if the film is subsequently deemed to be inadmissible, to expunge by judicial instruction.[23]
It need not be pointed out that the conditions of the present case could not be identical, or, in our opinion, especially similar. In some circumstances such as this, a video re-creation cannot be particularly accurate, and, thus, although relevant, was unduly prejudicial. It was, therefore, error to admit the video into evidence.
However, the introduction of demonstrative evidence is subject to a harmless error analysis.[24] The test for determining harmless error is whether the verdict actually rendered in the case was surely unattributable to the error.[25] Here, the State presented overwhelming evidence of Smith’s guilt, the most significant being her confession to placing the victim in the dryer and turning it on. Therefore, the guilty verdict was surely unattributable to the video. This assignment of error is without merit.
On our error patent review, we note the trial court failed to inform Smith of the prescriptive period within which she must apply for post-conviction relief, as required by La.C.Cr.P. art. 930.8. Although the commitment indicates that Smith was informed that she has two years from the date her judgment of conviction and sentence becomes final to seek post-conviction relief, the transcript does not. The transcript prevails. By way of this opinion, we hereby advise Smith that, pursuant to La. C.Cr.P. art. 930.8, no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed 11smore than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922.
In addition, the commitment is not consistent with the transcript in that it states that Smith was given credit for time served while the transcript does not. To insure an accurate record, we remand the matter for correction of the commitment to bring it into conformity with the sentencing transcript. The district court is directed to make the entries in the commitment reflecting this change and direct the clerk of court to transmit the original of the minute entry to the officer in charge of the *1126 institution to which Smith has been sentenced,[26] as well as to the Department of Corrections’ Legal Department.
For the foregoing reasons, the conviction and sentence are affirmed.

AFFIRMED

. State v. Leger, 05-0011, p. 10 (La.7/10/06), 936 So.2d 108, 122, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).

. State v. Hunt, 09-1589 (La. 12/1/09), 25 So.3d 746, 754 (citing State v. Benoit, 440 So.2d 129, 131 (La. 1983)).

. Leger, supra (citing State v. Sherman, 04-1019 (La. 10/29/04), 886 So.2d 1116; State v. Green, 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. State v. Cambrice, 10-26, p. 19 (La.App. 5 Cir. 4/26/11), 64 So.3d 363, 375 (citations omitted).

. State v. Reed, 05-801, p. 4 (La.App. 5 Cir. 2/27/06), 924 So.2d 1064, 1066.

. See, State v. Allen, 06-778, p. 12-13 (La. App. 5 Cir. 4/24/07), 955 So.2d 742, 752, writ denied sub nom. State ex rel. Allen v. State, 08-2432 (La. 1/30/09), 999 So.2d 754.

. Cambrice, supra.

. State v. Bradley, 03-384, pp. 11-12 (La.App. 5 Cir. 9/16/03), 858 So.2d 80, 88, writ denied, 03-2745 (La.2/13/04), 867 So.2d 688 and writ denied sub nom. State ex rel. Bradley v. State, 08-1951 (La. 1/30/09), 999 So.2d 750 (citing State v. Brown, 445 So.2d 456, 462 (La.App. 5 Cir. 1984)).

. 03-515 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, writ denied, 03-3272 (La.3/26/04), 871 So.2d 346.

. See also, State v. Salatich, 548 So.2d 17, 19 (La.App. 5 Cir. 1989).

. State v. Pugh, 02-171 (La.App. 5 Cir. 10/16/02), 831 So.2d 341, 352-53 (citations omitted).

. Id.

. State v. Reed, supra.

. State v. Hunt, 09-1589 (La.12/1/09), 25 So.3d 746, 754.

. State v. Gaal, 01-376, p. 17 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 949, writ denied sub nom. State ex rel. Gaal v. State, 02-2335 (La. 10/3/03), 855 So.2d 294.

. State v. Rivet, 01-353, p. 11 (La.App. 5 Cir. 9/25/01), 798 So.2d 219, 227 (citing State v. Bretz, 394 So.2d 245, 251 (La.1981); State v. Jones, 99-1185, p. 20 (La.App. 5 Cir. 9/22/00), 769 So.2d 708, 719).

. See, Rivet, supra; Jones, supra.

. State v. Manieri, 378 So.2d 931, 932 (La. 1979).

. 329 So.2d 181, 187 (La. 1976).

. Id.., See also, State v. Boyer, 406 So.2d 143 (La. 1981).

. State v. Trahan, 576 So.2d 1, 8 (La. 1990).

. Id.

. State v. Ard, 08-1440, p. 8 (La.App. 4 Cir. 6/17/09), 15 So.3d 1166, 1170 (citing State v. Brown, 00-1951, p. 9 (La.App. 1 Cir. 5/11/01), 808 So.2d 622, 627).

.State v. Marsalis, 04-827, p. 8 (La.App. 5 Cir. 4/26/05), 902 So.2d 1081, 1087.

. See, La.C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).