# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-542


STATE OF LOUISIANA

VERSUS

## LEO PAUL THIBODEAUX, JR.


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 23723-13
HONORABLE GUY E. BRADBERRY, DISTRICT JUDGE

**********

## MARC T. AMY
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy and Phyllis M. Keaty, Judges.


**AFFIRMED WITH INSTRUCTIONS.**

**John Foster DeRosier**
**District Attorney**
**Elizabeth Brooks Hollins**
**Assistant District Attorney**
**Post Office Box 3206**
**Lake Charles, LA   70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Benjamin A. Cormier**
**1 Lakeshore Drive, Suite 120**
**Lake Charles, LA   70629**
**(337) 477-8782**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Leo Paul Thibodeaux, Jr.**

**AMY, Judge.**

A grand jury charged the defendant with second degree murder in connection with the death of his girlfriend. Prior to trial, the trial court conducted a *Prieur* hearing and determined that it would allow certain other crimes evidence to be introduced. A jury found the defendant guilty as charged, and the defendant was sentenced to life in prison with no possibility of parole. The defendant appeals. For the following reasons, we affirm the defendant's conviction and sentence. We further direct the trial court to send appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received said notice.

### Factual and Procedural Background

The record indicates that, in the early morning hours of March 28, 2012, the defendant, Leo Paul Thibodeaux, Jr., called his friend Chris Cooper,[1] who was with his friend Raphael Johnson. Cooper and Johnson drove to the defendant's home, which he shared with his girlfriend, Toni Frabbiele. Johnson testified at trial that he saw Cooper enter the defendant's home and then exit with a shotgun wrapped in his shirt. Cooper then drove away from the home and called 911. Cooper and Johnson met with Calcasieu Parish deputies on Highway 27, at which time Cooper exited his vehicle with the shotgun in his left hand. When the deputies ordered him to drop the shotgun, Cooper threw the shotgun on the ground. Deputies later retrieved a Springfield Arms single-shot 12-gauge shotgun which, per the trial testimony of Corporal Brandon Peresich, was missing a trigger guard

---

[1] Cooper was deceased at the time of trial.

and contained a spent shell casing. Johnson was unaware of whether the trigger guard was already missing before it fell to the ground.

According to Corporal Gordon McGee's testimony, he and other deputies responded to the defendant's home at approximately 3:16 that morning. Upon entering the home, deputies discovered Frabbiele's deceased body on a bed in one of the bedrooms. Deputies then found the defendant on a couch in the living room, holding a pocket knife and threatening to harm himself. When the defendant failed to drop his knife after deputies ordered him to do so, deputies deployed a Taser on the defendant and detained him. The record reflects that deputies then obtained a search warrant and searched the home, where they found a shotgun wad[2] in the mattress cover with Frabbiele's hair attached, letters apparently handwritten by Frabbiele located at the foot of the bed, a cell phone in Frabbiele's left hand with 911 dialed, and stains throughout the home appearing to be blood. Following his detainment, the defendant was interviewed by authorities and maintained that

---

[2] When asked at trial to explain shotgun wadding to the jury, State expert Colonel Timothy Scanlan testified as follows:

> [I]n general shotgun wadding kind of acts as a piston. So we talked about all those little pellets being loose inside the barrel of a shotgun. Well, the way a gun works is you have an explosion. The fancy word for it is deflagration. It's a pushing explosion. So when you have a bullet in a barrel, that gas is going to push up against the bullet and push it down the barrel.
>
> Well, if you have a bunch of little pellets and you have no piston, if you have nothing behind it the gas is just going to go by it. You have nothing to push it down, right. There's no tight fit.
>
> So what happens, what shotgun manufacturers do since the beginning of time with shotguns, is put a piston behind it. . . . Now most shotgun manufacturers, as so in this case, using all in one piece; that is a one piece wad system. So that one piece wad is in the gun. It has everything in it. So you have the cup that holds the gunpowder, and you have a wad system and leaves that kind of keep everything together; and that travels down the barrel as a piston, and then when it leaves the gun the wadding opens up and the shot goes downrange.

Frabbiele shot herself. Defendant's statement to the detectives further indicates that only he and Frabbiele were present in the home at the time.

Dr. Terry Welke, the Calcasieu Parish Coroner, testified that when he initially examined Frabbiele's body, he originally believed that the death was a suicide. However, he explained that he became concerned upon viewing photographs of the crime scene and noticing differing patterns of blood spatter on the walls of the bedroom, which led him to believe that there had been "two different trajectories" of gunshots. He also noted that while "shotgun wounds and suicides" typically consist of "contact gunshots[,]" "there was evidence of gunpowder stippling" on Frabbiele's skin, which he explained indicated to him "that the barrel was not in tight contact with the skin" when the shotgun was fired. Moreover, he explained that he observed the presence of soot "in the wound" but not on Frabbiele's skin, which indicated to him that "there were two separate wounds." Dr. Welke stated that due to these observations, he "went back in and re-evaluated" Frabbiele's body, this time finding an additional shotgun wad embedded in Frabbiele's facial bones. He further testified that, because he was aware that a shotgun wad had previously been found at the scene, and that "there's only one power piston, plastic wad, pellet containing container, whatever you want to call them, per shotgun shell,"[3] he concluded that Frabbiele "had died as the result of two shotgun wounds, as opposed to a single shotgun wound," such that he "changed [his] mind as a ruling from a suicide to a homicide[.]"

---

[3] At trial, defense expert Christopher Robinson explained that the term "power piston" is "a trademark made by Remington" to refer to Remington's wads, so that "[w]hen you hear the term power piston, they're just using that in exchange for just wadding."

3

The defendant was charged with second degree murder via a bill of indictment on September 26, 2013. At trial, the jury unanimously found him guilty as charged. He was sentenced to life in prison with no possibility of parole.

The defendant appeals, assigning as error:

[I.] That the Trial Court erred in allowing the State of Louisiana to proceed with an "other crimes" or *Prieur* hearing despite unreasonable notice being given to the Defendant. Further, that the Trial Court erred in admitting the *Prieur* evidence despite the ambiguity of the notice.

[II.] That the Trial Court erred in admitting inculpatory statements made by the Defendant, when the notice to admit inculpatory statements was not filed until a day after the trial was set to begin. This error furthered the undeniable notion that Trial Courts feel that any notice, no matter how short, is good notice when it comes to both 404 (b) (*Prieur* evidence) and notice of intent to use inculpatory statements.

[III.] That the Trial Court erred in allowing the introduction of demonstrative images relating to the design and operation of shotgun shells. The Defense was only notified of the existence of these images until [sic] the eve of trial. This severely prejudiced the Defendant as he was not able to digest the images, have an expert review those images, conduct a *Daubert* hearing, or prepare the Defense[']s own images to counter the State's images.

[IV.] That the Trial Court erred in allowing Dr. Terry Welke to testify as an expert in the areas of blood spatter, firearm, and ammunition. The Trial Court allowed an individual who had been tendered and accepted as an expert in forensic pathology to offer expert and opinion testimony as to at least two disciplines in which he was not an expert, and admitted that he had not [sic] expertise in.

[V.] That the Trial Court erred when it failed to grant the Defendant's motion for mistrial. The State elicited testimony from witnesses that the Court had previously held were inadmissible. The Defendant found himself forced to decide whether an admonition to the jury would bring more attention to the inadmissible statement. More importantly, it is impossible to expect a lay person to simply ignore some testimony or piece of evidence because a judge tells them to do so. It is no comfort when that individual is made to promise that they can ignore the statement or evidence. In this instance, the State played a recorded statement where the Defendant admitted to falling off the wagon and using drugs. These statements were to be redacted, however the State failed to do so. The Defendant's counsel received

the six-hour statement the day before it was played. The Defendant's counsel did not have time to review the discovery as he receive [sic] the redacted version until [sic] 6:00 p.m. the day before.

[VI.] That the Trial Court erred in denying the Defendant's request to have the following included in the jury instructions: "You may return a responsive verdict listed on the verdict form even though you find that the State has proved beyond a reasonable doubt every element of the offense charged[.]" The State of Louisiana improperly characterized this statement as a jury nullification instruction[,] and the Trial Court did not include the phrase in final jury instructions.

[VII.] That the Trial Court erred in allowing the jury to view evidence once they began deliberations. The jury requested to view certain pieces of evidence[,] and they were allowed to do so after jury deliberations began.

[VIII.] That the Trial Court erred in denying the Defendant's motion for new trial.

[IX.] That the evidence presented at trial was insufficient to convict the Defendant of Second Degree Murder[.]

**Discussion**

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. On review, we note that the record does not indicate that the trial court advised the defendant of the time period for filing for post-conviction relief as required by La.Code Crim.P. art. 930.8(C).[4] *See, e.g,* *State v. Lapoint*, 16-187 (La.App. 3 Cir. 9/28/16), 202 So.3d 593. Accordingly, we direct the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of

---

[4] Louisiana Code of Criminal Procedure Article 930.8(C) provides, in pertinent part: "At the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief either verbally or in writing."

the rendition of this opinion and to file written proof into the record that the defendant received the notice.

*Sufficiency of Evidence*

We address the defendant's final assignment of error first, as a finding that the evidence was insufficient to support a conviction would require an acquittal. *See State v. Hearold*, 603 So.2d 731 (La.1992). In this regard, the defendant's appellate brief contains only one sentence in support of this assignment of error, which states: "Without the inadmissible testimony[,] it is clear that there would not have been sufficient evidence presented at trial to convict the defendant." However, we note that even inadmissible testimony must be considered in a sufficiency of evidence analysis:

> When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.
>
> On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial.

*Id.* at 734. Accordingly, because the defendant does not set forth a proper insufficiency of evidence claim, we find that this assignment of error lacks merit.[5]

We turn to consideration of the defendant's remaining assignments of error.

---

[5] Additionally, we note that the defendant has failed to brief this assignment of error outside of the single aforementioned sentence. *See* Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4) (providing that "[a]ll assignments of error and issues for review must be briefed. The court may consider as abandoned any assignment of error or issue for review which has not been briefed.").

*Notice of Prieur Hearing*

In his first assignment of error, the defendant argues that he did not receive sufficient notice of the hearing on the admissibility of other crimes evidence pursuant to *State v. Prieur*, 277 So.2d 126 (La.1973), *modified by State v. Taylor*, 16-1124, 16-1183 (La. 12/1/16), ___ So.3d ___. On April 29, 2015, the defendant received a "*Prieur* notice" from the State regarding its intention to introduce evidence of the defendant's other crimes, wrongs, or acts pursuant to La.Code Evid. art. 404(B). The date of the *Prieur* hearing listed on the notice was March 1, 2015, which had already passed. The defendant alleges that his trial counsel later received a handwritten note indicating that the hearing would be held on May 1, 2015, but because his trial counsel was already scheduled to represent another person in a trial on that date, the hearing was rescheduled for May 11, 2015, which was also the date set for the defendant's trial. Accordingly, the defendant maintains that he was prejudiced by the "lateness" of the State's notice. The defendant also argues that he was prejudiced by what he describes as "the extreme vagueness of the facts laid out" in the *Prieur* notice, complaining that the notice listed unnamed "law enforcement testimony" as a witness and that the notice lacked the dates, times, and facts of the defendant's alleged other crimes.

At the beginning of the hearing on May 11, the defendant objected to the State's notice on the grounds discussed above. The trial court overruled this objection and allowed the hearing to go forward. The trial court ultimately denied in part and granted in part the State's motion, determining that it would only allow the State to introduce evidence pertaining to the defendant's arrest for domestic violence against Frabbiele.

A trial court's finding that the State complied with the requirements of *Prieur*, as well as its determination of the admissibility of other crimes evidence, cannot be disturbed absent an abuse of discretion. *See State v. Garcia*, 09-1578 (La. 11/16/12), 108 So.3d 1, *cert. denied*, ____ U.S. ____, 133 S.Ct. 2863 (2013). Moreover, if a trial court improperly admits other crimes evidence, that error is subject to a harmless error analysis, with an error being harmless if the verdict is "surely unattributable" to the error. *Id.* at 39 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081 (1993)).

We find that an analysis of whether notice was inadequate is unnecessary, because even in the event any error occurred, it was harmless. Notably, the State provided evidence that Frabbiele suffered two shotgun wounds to the head, obviating the defendant's theory that she either committed suicide or shot herself accidentally. Moreover, it is apparent from his statement to detectives that defendant and Frabbiele were alone in the house at the time she died. Thus, we find that the guilty verdict was surely unattributable to the other crimes evidence presented at trial. For these reasons, we find that this assignment of error lacks merit.

*Notice of Intent to Introduce Inculpatory Statements*

In his second assignment of error, the defendant argues that he was prejudiced by the State moving to introduce two of his inculpatory statements on the date trial was set to begin. The defendant argues that because the State waited until this date to give notice, he did "not have any time to investigate the individuals making the claims" or "to conduct legal research in preparation for arguing the merits of the notice."

Regarding notice of the State's intention to introduce inculpatory statements, La.Code Crim.P.art. 768 provides the following:

> Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing *prior to beginning the state's opening statement*. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.

(Emphasis added). The State's failure to provide adequate notice of intent to introduce inculpatory statements is subject to a harmless error analysis. *See State v. Quimby*, 419 So.2d 951 (La.1982). Specifically, "the error may be harmless if the remaining evidence of guilt is overwhelming." *Id.* at 958. *See also State v. Curington*, 09-867, (La.App. 5 Cir. 10/26/10), 51 So.3d 764, *writ denied*, 10-2612 (La. 4/8/11), 61 So.3d 684.

In the instant case, the State's notice of intention to introduce inculpatory statements was timely, as it was given to the defendant before the commencement of the State's opening statement. Additionally, due to the overwhelming evidence of the defendant's guilt, as evidenced in the discussion of the previous assignment of error, we find that any error that may have occurred was harmless. For these reasons, we find that this assignment of error lacks merit.

*Notice of Intent to Introduce Shotgun Images*

In his third assignment of error, the defendant argues that he was prejudiced by the State providing notice "on the very eve of jury trial" that it planned to introduce images created by Dr. Welke depicting the function of a shotgun shell. The defendant argues that because he did not receive notice earlier, he did not have "enough time to file for and conduct a *Daubert* hearing[,]" to "consult with his own expert regarding the accuracy of the images[,]" or "to have an expert of his own prepare images that [he] could employ to counter those produced by the

State." He further argues that Dr. Welke "is a medical doctor and a forensic pathologist" who "has no expertise in ammunition or firearms."

Regarding the introduction of demonstrative evidence, the Louisiana Supreme Court has stated the following:

> The rule concerning the introduction of demonstrative evidence is that the foundation laid must establish that it is more probable than not that the evidence is connected with the case and that the evidence has some relevance which the trial court considers sufficient to warrant its introduction. Ultimate connexity is a factual matter for determination by the jury. Diagrams generally are admissible to aid the jury in understanding testimony if shown to be an accurate representation of the subject matter in question and the ruling of the trial court relative to admissibility will not be disturbed on appeal unless there has been abuse of discretion. In considering whether demonstrative evidence is admissible over objection that it is unduly inflammatory[,] the test to be applied is whether the proffered evidence is relevant to any material issue in dispute and, if so, whether its probative value exceeds its probable prejudicial effect.

*State v. Prestridge*, 399 So.2d 564, 573 (La.1981) (citations omitted). Furthermore, "the introduction of demonstrative evidence is subject to a harmless error analysis." *State v. Smith*, 11-638, p. 17 (La.App. 5 Cir. 3/13/12), 90 So.3d 1114, 1125. While the defendant contends that Dr. Welke was unqualified to create the images at issue, he does not contend that the images were inaccurate, nor does he demonstrate how the images were unduly prejudicial. We also find that, as discussed in previous assignments of error, any error that may have occurred was harmless. Therefore, we find that this assignment of error lacks merit.

*Dr. Welke's Testimony*

In his fourth assignment of error, the defendant alleges that the trial court erred in allowing Dr. Welke, who was qualified as an expert in forensic pathology, to testify regarding "both blood spatter and firearm mechanics as an expert." Within Dr. Welke's testimony, we note the following colloquy:

10

Q	All right. From the scene photographs, was there anything brought to you that was of interest to you?

A	Yes, sir.

Q	Could you tell the Jury what that was?

A	Well, initially when I had done my examination, usually, when we see -- I'm not a firearms expert, but gunshot wounds are my forte, and when someone dies as a result of a gunshot wound or shotgun wound, we try to make a determination of the distance; in other words, is the end of the barrel in contact tight to the skin, or is the end of the barrel a long way from the skin at the time of discharge? And when I did my initial examination -- like I said, the information, if I remember correctly, was called in and said that a wad -- and basically, what a wad is, it's a portion of a shotgun shell that separates the pellets from the powder. The powder is what burns, and then, basically, the gases and everything push the pellets out of the barrel. And when I did my examination, like I said, with shotgun wounds and suicides, we usually see contact gunshots -- or injuries, entry wounds, and in this particular instance, things just didn't make any sense to me because I saw something that I thought was a medium range, meaning there was evidence of gunpowder stippling, which means that the barrel was not in tight contact with the skin, and there was also some findings where there was soot inside of the wound, but no soot, which is like smoke -- and I did not see the smoke or the soot on the skin, but I saw it within the eye socket, so it didn't make -- something just didn't jive [sic] with me, so, anyhow, when Zeb and Charlie returned with the scene photographs, they showed those to me, and I am not a blood splatter expert, but I told Zeb and Charlie -- I paint. My wife and I paint the walls in our house, so I'm familiar with what paint does when you flick it off of a paintbrush. If you go straight on at a 90-degree angle, it makes little round circles, and makes those little things kind of shoot outwards, but if you hit a wall at an angle, it gives a tadpole effect, and in the scene photographs that they had shown me, over the headboard were these tadpole-like blood splatter findings, and, to me, that meant that it was at an angle at the time of discharge, or at the time that the pellets hit the body and the blood had expelled from the body, and then, on another wall which was adjacent to that and to the side -- alongside of the bed, the blood splatter was straight on, and so I thought there were two different trajectories, one at an angle --

MR. ALEXANDER:[6]

Your Honor, I'm going to object because he's just said he's not a blood splatter expert but he's proceeding to give opinion evidence on blood splatter.

A      Well, I'm not finished, sir.

THE COURT:

State?

MR. BRYANT:

He's allowed to testify as to -- he's a forensic pathologist who's allowed to testify as to what opinions he came to as to why he continued his investigation into this matter, and he is -- he viewed the photographs and why he continued his investigation into this matter, Your Honor. I think he's more than qualified to do this. He's done over five thousand autopsies, he's done gunshot wounds, and I think he's more than qualified to testify in this area.

THE COURT:

Objection's overruled. You may proceed.

A      So then I thought there were two different trajectories, and then, in conjunction with the fact that the findings I had found on the body did not jive [sic], did not sync, I went back in and re-evaluated Toni's body and was -- I taken what we call -- they're basically long tweezers, and starting probing the facial bones, and I found a second wad, which didn't -- there was one wad that was at the scene, and the second wad that was still in her facial bones, and this started to make more sense to me, because, then, I felt that Toni had been the result -- or had died as the result of two shotgun wounds, as opposed to a single shotgun wound, so I then asked Zeb and Charlie to return to the scene to take more photographs, and, by the time the day was over, I had gone from -- changed my mind as a ruling from a suicide to a homicide, meaning that someone had caused her death.

After review, we conclude that, rather than Dr. Welke testifying as an expert regarding firearms or blood spatter, he discussed these topics merely to explain the

---

[6] At trial, Mr. Alexander represented the defendant, and Mr. Bryant represented the State.

course of action he took in investigating Frabbiele's death. More specifically, his testimony in this regard pertained to his discovery of the second wad. Dr. Welke explained multiple times throughout his testimony that he was neither a firearms expert nor a blood spatter expert. Further, he stated that he did not base his conclusion regarding Frabbiele's "manner of death nor cause of death on blood splatter." Moreover, if the trial court erred in allowing Dr. Welke to testify regarding blood spatter and firearms, such error was harmless, as the State presented another witness, Colonel Timothy Scanlan, who qualified as an expert in blood spatter and firearm examination.

The defendant also argues that the trial court erred in prohibiting his expert witness, who was qualified in the areas of firearm examination, crime scene reconstruction, shooting reconstruction, and blood spatter, from testifying "in areas that fell squarely within his expertise, but were not included in his expert witness report." The defendant complains that he was held to a "double standard[,]" asserting that Dr. Welke was allowed to "give expert opinion testimony" as a layperson regarding blood spatter and firearms "without the notice[.]" However, as discussed above, we do not find that Dr. Welke testified as an expert in the areas of blood spatter or firearms. Moreover, the defendant's appellate brief fails to specify what testimony his expert was prohibited from providing. A review of the record reveals that while the defendant's expert was barred from testifying regarding his own analysis, as this had not been included in his expert witness report, he was able to present his opinion regarding the analyses of the State's expert witnesses. Accordingly, we find that this assignment of error lacks merit.

*Denial of Motion for Mistrial*

In his fifth assignment of error,[7] the defendant argues that the trial court erred in denying his motion for mistrial. The motion was made after the State played for the jury a recorded statement by the defendant containing information regarding the defendant's past drug use, which the State had previously agreed to redact. The defendant alleges that his trial counsel received the State's "redacted" version of the "five-hour statement at 6:00 p.m. the day before it would be played before the jury," and that accordingly, his trial counsel "did not have an opportunity to review" the entire statement. However, the defendant sets forth no statutory law or jurisprudence in support of his argument.

The fifth circuit dealt with a similar fact pattern in *State v. Lagarde*, 07-123 (La.App. 5 Cir. 5/29/07), 960 So.2d 1105, *writ denied*, 07-1650 (La. 5/9/08), 980 So.2d 684. In *Lagarde*, the defendant argued that the trial court erred in denying his motion for mistrial after "the jury viewed an edited version of the defendant's statement that failed to omit a reference to the defendant's arrest for second degree murder." *Id.* at 1110. The panel stated that a "mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial." *Id.* at 1113. Moreover, a denial of a motion for mistrial cannot be disturbed absent an abuse of discretion, and an "impermissible reference to other crimes is subject to a harmless error analysis." *Id.* at 1114. The fifth circuit found no abuse of discretion in denying the motion for mistrial and stated

---

[7] In the argument section of the defendant's appellate brief, the defendant reverses the order of his fifth and sixth assignments of error, such that his discussion of his sixth assignment of error immediately precedes the discussion of his fifth assignment of error. For the purposes of this opinion, we discuss these assignments in the order that they are listed in the assignments of error section of the defendant's appellate brief.

14

that "even if the jury read or heard the brief reference to the defendant's 'second degree homicide' arrest, any error that occurred was harmless" due to the "evidence against the defendant[.]" *Id.* at 1114.

In the instant case, we do not find that the trial court abused its discretion in denying the defendant's motion for mistrial. We also find that even if the trial court had abused its discretion, the error was harmless, as the verdict was surely unattributable to the recorded statement's brief reference to the defendant's past drug use. For these reasons, we find that this assignment of error lacks merit.

*Denial of Special Jury Instruction Request*

In his next assignment of error, the defendant indicates that the trial court erred in denying his request for a special jury instruction. In a letter to the trial court dated May 7, 2015, the defendant requested the following special instruction: "You may return any responsive verdict listed on the verdict form even though you find that the State has proved beyond a reasonable doubt every element of the offense charged." The defendant argues that in requesting this jury instruction, he "simply sought to inform the jury that the jury had the option of returning a responsive verdict, even if they [felt] the State proved every element of the offense beyond a reasonable doubt." On May 14, 2015, the State filed a "State's Opposition to Defendant's Request for a Special Jury Instruction Regarding Jury Nullification." After the jury had been charged, the following colloquy occurred:

MR. ALEXANDER:

If this would be an appropriate time to make the formal objections on the record with regard to the jury instructions?

THE COURT:

It would be.

MR. ALEXANDER:

Because we haven't been on the record about that yet. It's just been called to my attention by Mr. Flammang that the form does not include -- can this be right -- it doesn't include the circumstantial evidence instruction?

THE COURT:

You read the form and approved the form before I gave the instruction.

MR. ALEXANDER:

I'm making my objection on the record now that it should contain the circumstantial evidence instruction. If he's right, it doesn't. That escaped my attention, but I wouldn't have had a chance to make an objection on the record until now, and so I make it.

I also, with regard to things that we have previously discussed, and I have a copy of the letter that I submitted on May 7th about the two that I requested in advance about the proposed special jury instructions. One about the responsive verdicts where I have requested quote, "You may return any responsive verdict listed on the verdict form even though you find that the State has proved beyond a reasonable doubt every element of the offense charged."

THE COURT:

Let the objection be noted. State, anything on the first objection being placed by Defense?

MR. BRYANT:

I thought everything had been approved. I looked through it and I didn't notice that, but I thought both side[s] had approved the jury instructions.

THE COURT:

And I do want to note this would be the opportune time to suggest that we met after close of proceedings yesterday in my chambers to approve. There were some corrections to be made, research to be had on some questions by Defense. We reconvened at 8:30 this morning for the second jury charge, upon which all the additions were made.

The Defense and the State suggested that they wish to change what the jury instruction was. I told them the only two ways they

could change it was to agree with each other by stipulation and/or the Court was going to follow standard treatise law as it relates to instructions. That was placed on the record.

We had a third and subsequent meeting on the jury instructions at the conclusion of the Defense case in open court in which the jury charges, which I just read to the jury were promulgated, received by each party, given an opportunity to respond, upon which the Defense suggested that there was going to be a stipulated agreement that the language included that was inconsistent with the instructions yesterday would be included.

That was by stipulation, and as a result thereof the Court allowed this matter to proceed with closing arguments and now as we find ourselves with a charged Jury.

According to La.Code Crim.P. art. 807, "[a] requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." In *State v. Sharp*, 35,714, p. 19 (La.App. 2 Cir. 2/27/02), 810 So.2d 1179, 1191, the defendant argued that the trial court erred in failing to give the following requested jury instruction: "You the jury have the option to convict the defendant of a lesser offense, even though the evidence clearly and overwhelmingly supports a conviction of the charged offense." Finding no error in this regard, the second circuit stated the following:

Clearly, the first portion of the special instruction requested by [the defendant] was an attempt to reiterate more specifically the law of responsive verdicts to the jury, i.e., even if the evidence supports second degree murder, you can return a manslaughter verdict. Although arguably a technically correct statement,[8] it is one which is integrated within the responsive verdict law. The jury was clearly instructed that it could return a verdict of guilty to the lesser included offense of manslaughter. To expound the responsive verdict law in the way that [the defendant] suggests would, in our opinion, require, at the very least, qualification and certainly explanation. There is no

---

[8] *See State v. Porter*, 93-1106 (La. 7/5/94), 639 So.2d 1137. In *Porter*, the supreme court explained: "Treating the jury's prerogative to return a responsive verdict similar to the jury's power of nullification, this court has consistently held that the jury must be given the option to convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged offense." *Id.* at 1140 (footnote omitted).

Louisiana jurisprudence supporting an argument that it is proper to instruct a jury that it can disobey law and reach a verdict inconsistent with the evidence. In this case, the general instruction was adequate to instruct the jury on this point. The trial judge obviously agreed. Finally, with the general instructions clearly listing manslaughter as a lesser included verdict to second degree murder, [the defendant's] request to inform the jury that in any second degree murder case you may return a verdict of manslaughter would have been redundant.

*Id.* at 1192.

In the instant case, after the trial court explained to the jury the elements of second degree murder as well as its responsive verdicts, it stated the following: "If the State has failed to prove beyond a reasonable doubt that the defendant is guilty of the offense charged or of the lesser included offenses, your verdict should be not guilty." We find that, as in *Sharp*, the trial court sufficiently instructed the jury regarding its ability to return a responsive verdict, such that inclusion of the defendant's instruction was unnecessary. Accordingly, we find that this assignment of error lacks merit.

*Jury Examination of Autopsy Photographs*

In his seventh assignment of error, the defendant argues that the trial court erred in allowing the jury to examine autopsy photographs during jury deliberations. The defendant argues, without citing to any statutory law or jurisprudence, that these photographs could have "provoke[d] an emotional reaction" in the jury and that it was "clearly prejudicial" to allow the jury to view those photographs. However, a trial court is permitted to allow jurors to view any object received in evidence, including photographs, during deliberations. *See* La.Code Crim.P. art. 793(A); *see also State v. Davis*, 92-1623 (La. 5/23/94), 637 So.2d 1012, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450 (1994). Thus, we find that this assignment of error lacks merit.

*Denial of Motion for New Trial*

In his eighth assignment of error, the defendant argues that the trial court erred in denying his motion for new trial. In support of this argument, the defendant reiterates his previous assignments of error, indicating that it was "impossible" for the defendant to "receive a fair trial" given these errors.

We have above determined that each of the defendant's previous assignments of error lack merit. Moreover, Louisiana jurisprudence does not recognize such "cumulative error" arguments. *See State v. Blank*, 16-213 (La. 5/13/16), 192 So.3d 93; *see also State v. Kelly*, 14-522 (La.App. 3 Cir. 12/10/14), 153 So.3d 1257, *aff'd in part*, 15-484 (La. 6/29/16), 195 So.3d 449. For these reasons, we find that this assignment of error lacks merit.

## DECREE

For the foregoing reasons, the conviction of the defendant, Leo Paul Thibodeaux, Jr., is affirmed. We further direct the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received notice.

**AFFIRMED WITH INSTRUCTIONS.**